556 So.2d 303 (1989)
A. Stephen McDaniel, Administrator of Estate of Alton Jerry Speaks, Deceased; Southern Institute of Aviation, Inc., d/b/a Memphis Jet Center; Memphis Aviation, Inc., d/b/a Memphis Jet Center; and J.B. Gaiennie
v.
Glenda J. RITTER and Rebecca F. Ritter.
No. 07-59440.
Supreme Court of Mississippi.
November 29, 1989.
Rehearing Denied February 14, 1990.
*304 Michael Farrell, Wells, Moore, Simmons, Stubblefield & Neeld, Jackson, Charles G. Walker, Petkoff, Lancaster & Walker, Memphis, Tenn., Kenna L. Mansfield, Jr., Wells, Wells, Marble & Hurst, Jackson, for appellants.
Mignon M. DeLaschmet, Wayne E. Ferrell, Jr., Ferrell & Hubbard, Jackson, William W. Ballard, Hernando, John B. Farese, Farese, Farese & Farese, Ashland, for appellees.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Today's appeal arises from the fatal flight of a Memphis-based Beechcraft Bonanza B-36 airplane which experienced severe icing and crashed near Joplin, Missouri, killing pilot and passenger. The passenger's survivors have brought a wrongful death action in this state, suing the estate of the deceased pilot and everyone else in sight. Apparently crediting an assumption of risk defense theory, the jury found for the four defendants who had not been dismissed summarily. In due course, the trial judge held that he had erred in submitting the issue of assumption of risk to the jury and granted a new trial.
*305 Believing the interests of litigant and judicial economy may be served thereby, we accepted Defendants' interlocutory appeal to settle the controlling issues of law prior to retrial. We affirm in part and reverse in part.

II.
The facts of the case are relatively simple  the cast of characters and reach of potential liability and identification of law governing same quite complex.
The Plaintiffs are (1) Glenda J. Ritter, second wife of Jack Ritter, Jr., married to him at the time of the fatal accident and a resident of Olive Branch, Mississippi; (2) the minor children of Jack Ritter, Jr., who all live in Holly Springs, Mississippi, represented by their mother, Rebecca F. Ritter, divorced from Jack in 1979. Plaintiffs are Ritter's personal representatives, Miss. Code Ann. § 11-7-13 (Supp. 1989), and are Appellees here.
Appellants today, and among the corporate and individual parties originally named as Defendants[1] in this action are: (1) A. Stephen McDaniel, Administrator of Estate of Alton Jerry Speaks, deceased, who was alleged to be the pilot of the aircraft at the time of the accident; (2) Southern Institute of Aviation, Inc. d/b/a Memphis Jet Center (hereafter "SIA"), a Tennessee corporation with its principal place of business in Memphis, the aircraft charter company which had rented the plane to Speaks and Ritter; (3) Memphis Aviation, Inc., d/b/a Memphis Jet Center, a Tennessee corporation affiliated with SIA and responsible for the maintenance of the Memphis Jet Center charter fleet of aircraft; and (4) J.B. Gaiennie, a Memphis, Tennessee resident, the owner of record of the Beechcraft Bonanza.
Jack Ritter and Alton Jerry Speaks were marketing agents (salesmen) for various agricultural supply and leasing corporations, some of which were partially owned by Speaks. Ritter was a resident citizen of Olive Branch, whose base of business operations lay in Memphis. Speaks was a resident citizen of Memphis, where he had his business base as well. Both held pilot's licenses, although Speaks was by far the more experienced of the two.
On March 19, 1984, Speaks rented a Beechcraft Bonanza aircraft from SIA in Memphis and flew Ritter and himself to Springfield, Missouri. Later the same day, their business in Springfield completed, the two decided to fly to nearby Joplin some thirty minutes away for a social visit to Speaks' mother-in-law. They departed Springfield without obtaining a full weather briefing. En route, the Beechcraft Bonanza B-36 experienced severe icing conditions, became weighted down by "rime ice" (a particularly dangerous form of frozen froth), and crashed while attempting to land near Joplin, killing the two men.
Ritter's survivors commenced this wrongful death action on November 2, 1984 in the Circuit Court of Hinds County. Plaintiffs charged Speaks with negligent aviation and demanded judgment of and from his estate. Plaintiffs further charged liability on the part of SIA, Memphis Aviation, and Gaiennie upon the allegations that these corporate and individual owners were negligent in the lease, maintenance and ownership of the crashed aircraft. In addition, Plaintiffs alleged that Miss. Code Ann. § 61-11-1, et seq. (1972) and the Federal Aviation Act of 1958, 49 U.S.C.App. § 1301 et seq. (1970), impose strict vicarious liability upon the owners and lessors of aircraft.
Trial began in the Circuit Court of Hinds County on May 18, 1987. At the close of the evidence, the Circuit Court held Speaks negligent in piloting the Bonanza, and that his negligence proximately caused Jack Ritter's death. The Court granted Plaintiffs a directed verdict on those issues. Rule 50(a), Miss.R.Civ.P.
Of significance was the Circuit Court's ruling on the defense of assumption of the risk. The Court refused Plaintiffs' request for a comparative negligence instruction, submitting to the jury only whether Ritter had assumed the risk of injury or death by *306 accompanying Speaks into weather which he, as a pilot himself, must have known to be dangerous. Both parties had drafted assumption of the risk instructions. See Rule 3.09, Unif.Cir.Ct.Rules. The Court submitted to the jury that offered by the Plaintiffs. In due course, the jury returned a verdict for all Defendants. Plaintiffs timely moved for a new trial, Rule 59, Miss.R.Civ.P., and the Court granted Plaintiffs' motion, holding that it had erred in granting the assumption of the risk instruction.
The Defendants then moved the Circuit Court to allow an interlocutory appeal of all issues in the case which had been resolved adversely to them. On January 26, 1988, the Circuit Court denied this motion. The Defendants then petitioned this Court for leave to appeal the Circuit Court's grant of a new trial, again raising the various issues upon which they had not prevailed in their various summary judgment motions. By order entered March 16, 1988, this Court granted the interlocutory appeal.

III.
At the outset, the Plaintiffs/Appellees, the Ritters, seek to limit the issues presented for review. Their premise is that the order granting the new trial is all that is the subject of this interlocutory appeal. Since that order addressed only the assumption of the risk/comparative negligence jury instructions, the appeal should be limited to those issues, or so we are told. The Ritters rely upon the Circuit Court's denial of the defendants' motion for interlocutory appeal relating to the broader range of issues.
Our appellate jurisdiction extends to cases and not just issues. While we normally limit our review to specific issues presented by the parties, that limitation is one of expedition and not jurisdiction, else how our familiar plain error rule. See Rule 28(a)(3), Miss.Sup.Ct.Rules; and Rule 103(d), Miss.R.Ev. Interlocutory appeals are no different.
Interlocutory appeals are governed by Rule 5, Miss.Sup.Ct.Rules. By its own terms Rule 5 does not require certification of the issues by the lower court. The rule states:
An appeal from an interlocutory order may be sought if the order grants or denies certification by the trial court that a substantial basis exists for a difference of opinion on a question of law... .
The Advisory Committee Comment to Rule 5 notes: "the rule contemplates that either the trial court will grant an interlocutory appeal subject to appellate review of that decision, ... or the Supreme Court will grant the appeal itself." Under Rule 5, the scope of the issues presented for appellate resolution is ordinarily and practically restricted only by the contents of the petition presented to this Court pursuant to Rule 5(b), not the order of the trial court. Moreover, once a case becomes subject to our appellate jurisdiction, we have authority to address all matters as may appear in the interests of justice and economy.[2]
Of course acceptance of this appeal is not obligatory in any sense, and for pragmatic reasons we deny most petitions for interlocutory appeal. The grant of a new trial may not be appealed of right, as there has been no final judgment. Maxwell v. Illinois Central Gulf Railroad, 513 So.2d 901, 908 (Miss. 1987); Bowman v. Rutledge, 369 So.2d 768, 769 (Miss. 1979); Street v. Lokey, 209 Miss. 412, 413, 47 So.2d 816 (1950).
We have precedent of recent vintage for discretionary grant of an interlocutory appeal from an order granting a new trial. Clark v. Viniard By and Through Viniard, 548 So.2d 987, 988 (Miss. 1989). The parties have completed an expensive and time consuming trial and face another. Difficult issues have been sharply contested. Appellate consideration of those issues *307 at this time likely will "materially advance the termination of the litigation and avoid exceptional expense to the parties." Rule 5(a)(1), Miss.Sup.Ct.Rules. We have exercised our discretion, granted the interlocutory appeal, and now consider and decide the issues discussed below.

IV.
The Defendant/Appellants argue that they may not be held subject to in personam jurisdiction in Mississippi. Because of the disposition we make of the case on other issues,[3] we need only consider the point with respect to defendant/appellant Stephen McDaniel, Administrator of the Estate of Alton Jerry Speaks, deceased.
Two distinct questions must be addressed.[4] First, we inquire whether the estate of Speaks was amenable to suit here by virtue of the Mississippi Long Arm Statute. Miss. Code Ann. § 13-3-57 (Supp. *308 1989). Assuming an affirmative answer there, the question is whether the estate of Speaks may be amenable to suit in Mississippi consistent with the due process clauses of the federal constitution, and, as well, this state's constitution, that is, the familiar minimum contacts rule.

A. Mississippi Long Arm Statute

Section 13-3-57, in relevant part, declares
Any non-resident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the constitution or laws of this state as to doing business herein, who shall ... do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi.
Any such non-resident is declared amenable to suit in Mississippi "in any actions or proceedings accrued or accruing from such act or acts, or as an incident thereto, ... ." [Emphasis supplied] This latter clause will acquire significance below.
The Long Arm Statute specifically addresses the power of a Mississippi court to gain in personam jurisdiction over a foreign executor or administrator:
Any such cause of action against any such nonresident, in the event of death or inability to act for itself or himself, shall survive against the executor, administrator, receiver, trustee, or any other selected or appointed representative of such nonresident.
* * * * * *
The doing of such business, or the engaging in any such work or service in this state, or the making of such contract, or the committing of such tort in this state, shall be deemed to be a signification of such nonresident's agreement that any process against it or its representative which is so served upon the secretary of state shall be of the same legal force and effect as if served on the nonresident at its principal place of business in the state or country where it is incorporated and according to the law of that state or country.
Miss. Code Ann. § 13-3-57 (1972 & Supp. 1989) [emphasis supplied].
The use of the word "representative" (1) encompasses executors and administrators of an estate and (2) contemplates that the actions of a decedent during his lifetime which would have rendered him amenable to suit here will similarly subject his administrator or executor (i.e. his personal "representative") to in personam jurisdiction in Mississippi.
Such a view is consonant with the Restatement (Second) of Conflict of Laws, § 358 (1971) which declares:
An action may be maintained against a foreign executor or administrator upon a claim against the decedent when the local law of the forum authorizes suit in the state against the executor or administrator and
(a) suit could have been maintained within the state against the decedent during his lifetime because of the existence of a basis of jurisdiction other than mere physical presence, or
(b) the executor or administrator has done an act in the state in his official capacity.
Determinations of whether a defendant is "doing business" within the state proceeds on an ad hoc basis. Miss Cal 204, Ltd. v. Upchurch, 465 So.2d 326, 330 (Miss. 1985); S & A Realty Co. v. Hilburn, 249 So.2d 379, 382 (Miss. 1971). Our review of jurisdictional issues is essentially de novo: "In making this determination, this Court is in the same position as the trial court, since all facts are set out in the pleadings or exhibits, and the chancellor may be reversed if he erred whether the error was manifest or not." Miss Cal, 465 So.2d at 330.
The record reflects that
(1) Speaks was a native Mississippian, although he was a citizen of Tennessee at all times relevant hereto.
(2) Speaks had incorporated Consolidated Enterprises, Inc. as a Mississippi corporation  this corporation was Ritter's employer.
(3) Speaks had entered into a partnership, S & S Enterprises, which conducted *309 business in Mississippi and owned land near Sardis, Mississippi.
(4) He was a principal stockholder of Consolidated Agri Leasing, a Tennessee corporation which is qualified to do business in Mississippi and which in fact does conduct business here.
Speaks was doing business in Mississippi in the sense that he did various acts here for the purpose of realizing a pecuniary benefit or otherwise accomplishing an object. Restatement (Second) of Conflict of Laws § 35, Comment a (1971). Though his domestic and business residences were in Memphis, Speaks' presence within Mississippi was of such a continuing and substantial a nature that we regard him doing business here within the meaning and contemplation of Section 13-3-57.
We are told that in personam jurisdiction over Speaks' Estate must nevertheless fail for lack of a sufficient nexus between Speaks' Mississippi activity and the Ritters' claim. The long arm statute requires no direct nexus to the non-resident's business done here, only that the claim be incident thereto. The statute thus requires far less than that the liability generating conduct have occurred in Mississippi. Here we focus upon Consolidated Enterprises, Inc., a Mississippi corporation, organized by Speaks and of which Speaks was the principal shareholder. Consolidated is engaged in the business of leasing dairy cows to farmers and has an office in Columbus, Mississippi. Speaks was a director and officer  an employee, if you will  of the corporation which paid him a salary. Consolidated Enterprises also employed Ritter. Speaks' and Ritter's trip to Missouri (though not necessarily to Joplin) was on behalf of Consolidated. The fatal crash occurred before their return to Memphis.
On these facts, we hold the Plaintiffs Ritter's claim to have arisen out of facts sufficiently incident to business done by Speaks in Mississippi that Speaks' estate is amenable to suit here under Section 13-3-57.

B. Minimum Contacts/Due Process

The general principle regarding the exercise of jurisdiction over a nonresident is that he "may not be subjected to a litigation in a foreign jurisdiction unless he has `certain minimum contacts with it such that the maintenance of the suit does not offend the traditional notions of fair play and substantial justice'. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, 102 (1945)." Administrators of the Tulane Ed. Fund v. Cooley, 462 So.2d 696, 702 (Miss. 1984). These contacts must amount to something more than occasional "fortuitous" instances where the defendant had in the past come into some casual, isolated contact with an in-state resident. Cooley, 462 So.2d at 703 (citing Worldwide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490, 500 (1980))
"Purposeful activity" by a non-resident in the forum state may subject him to in personam jurisdiction there. If a nonresident corporate or individual defendant has "purposefully availed itself of the privilege of conducting activities within the forum state", then it is considered not "unfair" that the nonresident's important rights be adjudged in that forum. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). See Wilkinson v. Mercantile National Bank, 529 So.2d 616, 618-20 (Miss. 1988); Anderson v. Sonat Exploration Co., 523 So.2d 1024, 1026-27 (Miss. 1988).
We perceive no constitutional imperative that the action arise out of the non-resident defendant's contacts/activities in this state. Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404, 411 (1984); Perkins v. Benquet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952); Administrators of the Tulane Educational Fund v. Cooley, 462 So.2d 696, 703 (Miss. 1984). All that is required is that the non-resident defendant have continuous and systematic general contacts with this state. See Restatement (Second) of Conflict of Laws § 35(3) (1971). In the latter years of his life, Speaks had such Mississippi contacts.
*310 The Circuit Court did not err in holding the Estate of Speaks subject to in personam jurisdiction in this state.

V.
Points of personal jurisdiction settled, we turn to questions of choice of substantive law. By order dated May 12, 1987, the Circuit Court granted Plaintiffs' motion that Mississippi law be applied to all aspects of the case. Defendants had opposed the motion, contending that Tennessee law was applicable, as that state had the most significant relationship to both the events giving rise to the lawsuit and the parties involved. Defendants reassert the point on appeal.
Since Craig v. Columbus Compress & Warehouse Co., 210 So.2d 645, 649 (Miss. 1968) and Mitchell v. Craft, 211 So.2d 509 (Miss. 1968), Mississippi has ascribed to the most significant relationship test embodied in the Restatement (Second) of Conflicts of Law.[5] This general view has been reaffirmed in a number of cases, culminating in Boardman v. United Services Automobile Association, 470 So.2d 1024 (Miss. 1985); see also White v. Malone Properties, Inc., 494 So.2d 576, 578 (Miss. 1986). Nothing in Williams v. Taylor Machinery, Inc., 529 So.2d 606, 609 (Miss. 1988), or Shewbrooks v. A.C. & S, Inc., 529 So.2d 557, 564-68 (Miss. 1988) suggests a differing view on any of the choice of law issues presented today.
The Restatement (Second) § 145 governs choice of law questions in tort actions and provides:
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties,
(d) the place where the relationship, if any, between the parties is centered.
These contacts are evaluated according to their relative importance with respect to the particular issue.[6]
The principles of Sections 6 and 145 of the Restatement (Second) defy mechanical application  they are less "rules of law" than generally-stated guideposts. Additionally, the factors relevant to issues of in personam jurisdiction and those regarding choice of law must be kept distinct. While a foreign defendant may have sufficient contacts to be amenable to suit in Mississippi, it does not necessarily follow "that Mississippi substantive law will govern the rights and liabilities of the parties." Boardman, 470 So.2d at 1035; see also Administrators of the Tulane Educational Fund v. Cooley, 462 So.2d 696, 701 (Miss. 1984). For in personam jurisdiction purposes, the court focuses upon the contacts of a single party. On choice of law we look at all contacts of all parties  and more. Minimum contacts suffice for in personam jurisdiction. Choice of law seeks the state where the contacts are maximized.
Joplin, Missouri, the locus delicti, was not quite as fortuitous as in some fatal aircraft accident suits. See Proprietors Insurance Company v. Valsecchi, 435 So.2d 290, 294-97 (Fla.App. 1983). Still, this is one of those cases where locus bears little relation to the parties. Where the *311 plane went down will not necessarily control the choice of law issues before us if with respect to a given issue another state has a more significant relationship. See Vick v. Cochran, 316 So.2d 242, 246 (Miss. 1975); Turner v. Pickens, 235 So.2d 272, 274 (Miss. 1970); Mitchell v. Craft, 211 So.2d 509, 512 (Miss. 1968); Restatement (Second) of Conflict of Laws §§ 145, Comment e, 146 and 175 (1971).
Before proceeding, a seriatim notation of the seemingly significant facts may be of benefit. These facts are:
(1) The Beechcraft Bonanza was registered in the state of Tennessee.
(2) The aircraft was owned by defendant J.B. Gaiennie, a Tennessee resident.
(3) The aircraft was hangared at the Memphis, Tennessee, airport.
(4) The lease-back arrangement between Gaiennie and Memphis Jetcenter was negotiated and entered into in Tennessee.
(5) The lessors of the aircraft, the Memphis Jetcenter companies, are Tennessee corporations centered in Memphis.
(6) On the occasion at issue, the aircraft was leased by Consolidated Agri Leasing, Inc., a Tennessee corporation centered in Memphis, which had leased various aircraft (through Speaks) from the Jetcenter on fifty-nine previous occasions.
(7) The flight originated from the Memphis Airport; plans had called for the flight to terminate there as well.
(8) The pilot was Jerry Speaks, a Tennessee resident.
(9) Plaintiffs' decedent, Jack Ritter, was a resident of Olive Branch, Mississippi, a commuter with his business base in Memphis.
(10) Plaintiffs, the heirs of Jack Ritter, are all Mississippi residents.
(11) Ritter was employed by Consolidated Enterprises, a Mississippi corporation having its principal place of business in Memphis.
The Plaintiffs emphasize that Ritter lived in Mississippi and was employed by a Mississippi corporation and that this employment was the central relationship which led him to Joplin. In truth and in fact, Tennessee was Ritter's business base. Of importance is the pilot/passenger relationship between Speaks and Ritter which was established in Memphis. See Vick v. Cochran, 316 So.2d 242, 246 (Miss. 1975) (application of the Alabama "guest statute" where the "guest" relationship was established in Alabama). The interstate trip began and was to have ended in Memphis. Vick v. Cochran, 316 So.2d at 246. Of course, the record reflects incidental and on occasion not insignificant Mississippi contacts. The tort occurred in Missouri. Both in number and significance, the relevant "contacts" considered as a whole suggest without serious doubt that, vis-a-vis Mississippi or Missouri, Tennessee is the state with the most significant relationship to the occurrence and the parties.
The Circuit Court erred when it held Mississippi law applicable to all issues in the case, but that does not answer what state's law controls each specific issue, e.g., vicarious liability. "[T]he law of a single state does not necessarily control every issues in a given case. We apply the center of gravity test to each question presented, recognizing that the answer produced in some instances may be that the law of this state applies and on other questions in the same case the substantive law of another state may be enforceable." Boardman, 470 So.2d at 1031.

VI.
Our first substantive question is whether SIA, Memphis Aviation and Gaiennie may be held liable vicariously for damages occasioned by Speaks' neglect. The place of the accident and the tortious conduct, i.e., Missouri, is certainly relevant. Restatement (Second) of Conflicts of Laws §§ 145(2)(a) and 146 and 174 (1971). If the party injured or killed had been a Missourian, that state's law would control. Restatement, § 174, Comment b, Illustration 2 (1972). We find a distinct and predominant Tennessee flavor emanating from the ownership, management, maintenance, lease and operation of the aircraft, and, as well, the Tennessee contacts noted above. On these facts one may but conclude that *312 Tennessee law controls this particular issue. Cf. Vick v. Cochran, 316 So.2d at 246-48. The lone Mississippi contact with this issue is the presence of a Mississippi resident in the passenger's seat. This is not enough.
The Tennessee legislature has enacted that:
The liability of the owner of one aircraft to the owner of another aircraft or to aeronauts or passengers on either aircraft for damages caused by collision on land or in the air shall be determined by the rules of law applied to torts on land.
Tenn. Code Ann. § 42-1-106 (1964) (emphasis added). Lacking judicial guidance from Tennessee courts, we take the statute at face value.
Plaintiffs argue that this section only has application to collisions between two aircraft  an "air crash", for lack of a better term, not to the results of a single aircraft impacting against the ground. The position is untenable. But a moment's reflection recalls to mind that mother earth and her inherent power, the pull of gravity, are the pilot's primary peril. Earth is a larger and relatively more stationary object than another aircraft. Even when planes collide in the air, the damage occurs when each thereafter collides with earth. We perceive no rational principle which would exempt the owner in event of collision in the air but hold him liable as here where the plane collides with the ground  particularly where the cause of damage in the former case is likely not the collision in air but that with the ground.
The word "collision" means simply "striking together of two objects, one of which may be stationary... . The term implies an impact or sudden contact of a moving body with an obstruction in its line of motion, whether both bodies are in motion or one stationary and the other, no matter which, in motion." Black's Law Dictionary 239-40 (5th ed. 1979). Literalistic contortion does not generate legal construction where absurd results would obtain. See Johnson v. United States, 196 U.S. 1, 25 S.Ct. 158, 49 L.Ed. 363 (1904).
Turning to the Tennessee "law applied to torts on land," we find the familiar common law rule which declines to impose vicarious liability upon a bailor for the negligence of the bailee. Hamrick v. Spring City Motor Co., 708 S.W.2d 383, 385 (Tenn. 1986); Smith v. Bullington, 499 S.W.2d 649, 660 (Tenn. App. 1973); English v. Stephens, 35 Tenn. App. 557, 249 S.W.2d 908, 910 (Tenn. App. 1952), and Siegrist Bakery Co. v. Smith, 162 Tenn. 253, 36 S.W.2d 80, 81 (Tenn. 1931). We perceive no basis in Tennessee law for imposing vicarious liability upon SIA, Memphis Aviation or Gaiennie.
Nor may the Federal Aviation Act of 1958 be so construed.[7] 49 U.S.C.A.App. § 1301 et seq. (1971). Recent readings of this federal statute (and its state statutory clones) have limited liability solely to the pilots of aircraft. Broadway v. Webb, 462 F. Supp. 429, 433 (W.D.N.C. 1977); McCord v. Dixie Aviation, 450 F.2d 1129, 1130 (10th Cir.1971); Nachsin v. DeLaBretonne, *313 17 Cal. App.3d 637, 95 Cal. Rptr. 227, 228 (1971); Ferrari v. Byerly Aviation, Inc., 131 Ill. App.2d 747, 268 N.E.2d 558, 560-61 (1971); see also 2 S. Speiser & C. Krause, Aviation Tort Law § 14:3 (1979 & Supp. 1988); and L. Kreindler, Aviation Accident Law § 4.02 (1986).
In sum, we find no applicable or enforceable law, either state or federal in sovereign origin, under which SIA, Memphis Aviation or Gaiennie may be held vicariously liable for the negligence of pilot Speaks. The Circuit Court erred in holding otherwise. Since no other basis appears upon which liability may be imposed on these Defendants, or any of them, we may only hold that the Circuit Court erred when it denied the motion of each for a directed verdict at the close of the evidence, Rule 50(a), Miss.R.Civ.P., and, as well, when it granted Plaintiffs' motion for a new trial against these Defendants. To this extent, we reverse the judgment of the Circuit Court and render final judgment here in favor of SIA, Memphis Aviation and Gaiennie.

VII.
Defendants argued below, and renew the argument on this appeal, that the exclusiveness of liability provision of the applicable workers' compensation statute precludes a part of this action because Ritter, generally speaking, was on a business trip at the time of his death. Tenn. Code Ann. § 50-6-108 (Supp. 1988). Defendants' position is that "the applicable Workmen's Compensation statute covers business trips `from beginning to end.'" In view of our holding in Part VI above, the import of Defendants' point is that Plaintiffs would have no tort action against Estate of Speaks, for Speaks also was an employee of Consolidated Enterprises. Majors v. Moneymaker, 196 Tenn. 698, 704-05, 270 S.W.2d 328, 331 (1954); Spears v. Morris & Wallace Elevator Co., 684 S.W.2d 620, 621 (Tenn. App. 1984).
The facts leading up to the fatal flight, and the reason the two men chose to fly on that icy night, were extensively developed below. Speaks and Ritter often conducted business in southern Missouri and had made the acquaintance of two women who lived in Joplin. In fact, Speaks had recently married Janna Thomas, a Joplin native.[8] Ritter had developed a relationship (platonic we are told) with another Joplin resident, Gloria Gough. The four would often dine together when Ritter and Speaks were both in Joplin.
On the day in question, March 19, 1984, Ritter and Speaks arrived in Springfield and rented a car, giving the name of a local motel as their "local address" on the car rental form. The two met with a local "Consolidated" employee, Jeanne Rippee, at the nearby Mansfield office and indicated that they would be staying in the Springfield area through the following day. Speaks told Rippee that they would be able to help her take delivery of a new company pick-up truck the next day. Speaks also made arrangements to fly a prospective customer, Shirley Hambelton, from Mansfield to the Neosho, Missouri Airport on March 20 to inspect some chicken houses she might purchase. At some point during the day, Speaks telephoned his mother-in-law and arranged to dine with her that evening in Joplin. Ritter telephoned Gloria Gough at approximately 6:00 PM and invited her to join them for dinner that evening, as he would be accompanying Speaks to Joplin.
Defendants have but a single circumstance to support their claim the flight was business related  the arrangements made by Speaks with the Neosho chicken farmer, Jackie Osborne, to meet with a prospective buyer on the 20th. Neosho is in the general vicinity of Joplin. No one proposes to know whether Ritter and Speaks intended to return to Springfield or Mansfield after dinner in Joplin.
Defendants' contend that the entire Missouri trip of Speaks and Ritter was business-related *314  that their "business travel" would not conclude until their return to the Memphis Airport. This is far too general a mischaracterization to be of value. From the facts surrounding the flight the following seems clear: Speaks' and Ritter's business in Mansfield had concluded for the day, to resume the next morning in Mansfield. The "side-trip"[9] to Joplin which resulted in the death of the two men was for purely personal endeavors  a "frolic". As such, it lies outside the coverage of the Tennessee Workers' Compensation Act. Gregory v. Porter, 204 Tenn. 582, 322 S.W.2d 591, 592 (1959).
Enforcing our procedural law, Defendants' plea of protection from the compensation act's exclusiveness of liability provisions was an affirmative defense. Rule 8(c), Miss.R.Civ.P. As such, Defendants bore the burden of production and the risk of non-persuasion. Smith v. Sanders, 485 So.2d 1051, 1053 (Miss. 1986). The Circuit Court correctly held that the evidence regarding the proposed visit to the Neosho chicken farm was insufficient that a jury may reasonably have found that the two men were in the course and scope of their employment at the time of the crash. Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). Plaintiffs' tort action against Estate of Speaks is not barred by the exclusiveness of liability protections of the Tennessee Workers Compensation Act.

VIII.
As will be recalled, the Circuit Court granted the Plaintiffs' motion for a new trial on the ground that the assumption of risk instruction should not have been given. Defendants argue that this was error.
At trial the Court had refused Plaintiffs' request for a comparative negligence instruction, submitting to the jury only whether Ritter had assumed the risk of injury or death by accompanying Speaks into weather which he, as a pilot himself, must have known to be dangerous. In ruling on the matter, the Court stated:
I'm going to rule that this is not a contributory negligence case. It's a pure assumption of the risk case. There is no evidence of contributory negligence that overlaps with an assumption of risk... . In this case, Mr. Ritter could not have been negligent in any way and could only have assumed the risk of Mr. Speaks' negligence, therefore, a contributory negligence instruction is not warranted and it will be refused.
Both parties had drafted assumption of risk instructions. Rule 3.09, Unif.Cir.Ct. Rules. The Court submitted to the jury that offered by the plaintiffs.[10]
*315 Mitchell v. Craft and progeny again mandate that we seek Tennessee law, but when we do so we find a Tennessee choice of law rule that mandates enforcement of the law of the state where the accident occurred, the old lex loci rule, if you will. Winters v. Maxey, 481 S.W.2d 755, 756 (Tenn. 1972); Patterson v. Smith, 57 Tenn. App. 673, 424 S.W.2d 204, 208 (1965); see Smith, Choice of Law in the United States, 38 Hastings L.J. 1041, 1144-46 (1987). The accident occurred in Missouri.[11] That a Tennessee court would likely enforce Missouri law does not control us; it is but a factor.
To submit to a jury the matter of a plaintiff's (or, here Plaintiffs' decedent's) assumption of risk, Missouri law mandates that the defendant must demonstrate: (1) Knowledge on the part of the injured party of a condition inconsistent with his safety; (2) appreciation by the injured party of the danger of the condition; and (3) a deliberate and voluntary choice on the part of the injured party to expose his person to that danger in such a manner as to register assent on the continuance of the dangerous condition. Turpin v. Shoemaker, 427 S.W.2d 485, 489 (Mo. 1968); Day v. Mayberry, 421 S.W.2d 34, 42-43 (Mo. 1967); Terry v. Boss Hotels, Inc., 376 S.W.2d 239, 247-51 (Mo. 1964). Happily, Tennessee law appears the same.[12]Haga v. Blanc & West Lumber Co., 666 S.W.2d 61, 65 (Tenn. 1984); Ellithorpe v. Ford Motor Co., 503 S.W.2d 516, 522 (1973); Rogers v. Garrett, 217 Tenn. 282, 287, 397 S.W.2d 372 (1965). We need not decide which state's law would control were there a conflict.
The facts surrounding the fatal flight itself are threadbare. No one accompanied the men to the airport. All that is known about Speaks' flight preparations come from FAA recordings of radio transmissions between Speaks and the Springfield and Joplin control towers. What conversations Ritter overheard from the radio, what he knew or appreciated prior to takeoff is subject to the conjecture of both parties.
Defendants' trial theory was that, because Jack Ritter was also a pilot, he knew and appreciated the danger of flying into unknown weather conditions. Defendants further assert that Ritter could not help but appreciate the deteriorating weather conditions before departure and that this bolsters their premise that Ritter voluntarily placed himself into a position which he knew to be perilous.
The Plaintiffs Ritter, on the other hand, note facts that tend to exonerate their decedent from any assumption of risk:
(1) Weather conditions occurring at ground level are not informative of weather conditions at flying altitude, particularly regarding freezing temperature and icing conditions.
(2) Ritter's certification was limited to Visual Flight Rules (VFR), and he could be presumed to have relied upon Speaks' superior (IFR) training in instrument flying conditions.
(3) Defendants presented no evidence that Ritter was privy to any of Speaks' pre-flight communications, as the aircraft may have been equipped with earphones which allow only the pilot to hear the radio.
As is apparent, there is little "hard" evidence to support either scenario.
The skeletal record regarding the acts of Speaks and Ritter prior to the March 19 flight is legally insufficient to support the assumption of risk instruction as it is based entirely upon what might have happened. The evidence at trial, even giving the defense the benefit of every doubt, only raised an issue regarding Ritter's negligence. *316 That evidence did not, however, rise to a level approaching that required by law  that Ritter knew, appreciated and affirmatively chose to encounter the risk.
Even assuming that Ritter so assumed the risk of flying into bad weather, he cannot be assumed to have assented to the continuing negligence of Jerry Speaks. The Circuit Court found three distinct acts of negligence committed by Speaks: (1) failure to obtain the weather briefing; (2) failure to return to Springfield once the severity of the condition became apparent (FAA records indicated that Speaks reported severe icing five minutes into the thirty minute flight); and (3) failure to request an emergency "straight-in" landing in Joplin, choosing instead to take an approach requiring a banking maneuver, which reduced the aircraft's "lift".
To the point, Prosser notes:
It is not true that in any case where the plaintiff voluntarily encounters a known danger he necessarily consents to any future negligence of the defendant. A pedestrian who walks across the street in the middle of a block, through a stream of traffic traveling at excessive speed, cannot by any stretch of the imagination be found to consent that the drivers shall not use care to watch for him and avoid running him down... . This is contributory negligence pure and simple; it is not assumption of risk.
... [T]he plaintiff has exposed himself to the risk of future harm, but he has not consented to relieve the defendant of any future duty to act with reasonable care. This is a distinction which has baffled a great many law students, some judges, and unhappily a few very learned legal writers.
Prosser & Keeton, The Law of Torts § 68, at p. 485 (5th ed. 1984) (emphasis added).
The Circuit Court erred when it submitted to the jury the issue of Ritter's assumption of risk. The verdict may only be explained by assuming that the jury found that Ritter had indeed assumed the risk. Contrast McLeod v. Whitten, 413 So.2d 1020, 1023-24 (Miss. 1982); and Wallace v. J.C. Penney Co., 236 Miss. 367, 373-74, 109 So.2d 876, 878 (1959). The Circuit Court correctly held that the erroneous granting of the assumption of risk instruction required the grant of a new trial.

IX.
We have held that the Circuit Court correctly ruled that it had erred when it refused to submit the case to the jury on comparative negligence, i.e., that the Court had previously erred in holding this only an assumption of risk case. The case, of course, must now go back for a new trial against the Estate of Speaks. We have held above that Tennessee law controls several other liability issues, with respect both to the Estate of Speaks and other Defendants we this day exonerate. Tennessee holds to the common law rule that contributory negligence is a bar to a plaintiff's recovery in tort. Arnold v. Hayslett, 655 S.W.2d 941 (Tenn. 1983); Street v. Calvert, 541 S.W.2d 576 (Tenn. 1976). The question becomes whether this issue will be tried anew under Tennessee law or under a rule of comparative negligence, a suggestion instantly causing thought of our familiar statute. Miss. Code Ann. § 11-7-15 (1972).
Notwithstanding that another state may have the most significant relationship to a given issue, we have expressed our reluctance to enforce the law of that state where such would be offensive to the deeply ingrained or strongly felt public policy of this state. Boardman v. United Services Automobile Assoc., 470 So.2d 1024, 1038-39 (Miss. 1985). Following this principle,[13] we have preferred our comparative negligence *317 statute over the common law contributory negligence rules of other jurisdictions.[14]Fells v. Bowman, 274 So.2d 109, 112-13 (Miss. 1973); Mitchell v. Craft, 211 So.2d 509, 513-16 (Miss. 1968); see also Boardman, 470 So.2d at 1038 and Restatement (Second) of Conflict of Laws, §§ 6(2)(b), (c) and (e), 145 and 164(1) (1971). Both from the point of view of civil justice[15] and economic efficiency,[16] comparative negligence, as an approach to the effect that ought be given a plaintiff's contributory fault, is demonstrably superior to the traditional common law contributory negligence bar.
The fatal crash occurred in Missouri, which at least since 1983 has adhered to a regime of comparative fault. Love v. Park Lane Medical Center, 737 S.W.2d 720 (Mo. 1987); Gustafson v. Benda, 661 S.W.2d 11 (Mo. 1983); see Comment, Comparative Fault in Missouri, 50 Mo.L.Rev. 141 (1985). Our law recognizes as controlling the law of the state where the fault and the injury occur, absent a more significant relationship with another state. Mitchell v. Craft, 211 So.2d at 515-16; Restatement, §§ 145(2), 146 and 164(2) (1971). Mississippi comparative negligence law is not identical to Missouri's, but is quite similar in practical effect.
No extended discussion of the relevant interests, Mitchell, 211 So.2d at 516, and Restatement, § 6, is necessary. On the authority of the foregoing, we declare that upon retrial, the effect, if any, of Ritter's negligence, if any, will be governed by Mississippi's comparative negligence statute to the exclusion of the Tennessee contributory negligence rule.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REMANDED FOR A NEW TRIAL AGAINST ESTATE OF SPEAKS ONLY.
ROY NOBLE LEE, C.J., and PRATHER, ANDERSON, PITTMAN and BLASS, JJ., concur.
HAWKINS, and DAN M. LEE, P.JJ., and SULLIVAN, J., dissent.
SULLIVAN, J., writes separately.
HAWKINS, Presiding Justice, dissenting:
This case is before the Court on a interlocutory appeal from a circuit court order directing a new jury trial on all issues.
I respectfully dissent.
The Court erred in ever granting an interlocutory appeal, and had the motion for such appeal ever been presented en banc I would have dissented from the order granting it.
The authority of a trial judge to grant a new trial for perceived errors during trial is of ancient common law origin. Fayter v. Shore, 114 Fla. 115, 153 So. 511 (1934), and the power and duty of a circuit judge to grant a new trial when appropriate has been an integral part of our constitutional system since the beginning of this State's history. Jakup v. Lewis Grocer Co., 190 Miss. 444, 200 So. 597 (1941). The wisdom of the centuries has been that it is far better for the litigants and for the efficient administration of justice for the trial judge to correct his mistakes, himself, at the trial level, rather than burden the litigants and the appellate courts with a case he could have corrected on his own.
66 C.J.S. New Trial, § 1(b.) states:
b. Object; Function
The object or function of a motion for a new trial is to secure the correction of, or to give the trial court an opportunity to correct, errors occurring in the conduct *318 of the trial, without the delay, expense, or inconvenience of an appeal, and to preserve such errors for appellate review.
The purpose of the law relating to new trial has been said to be that the court be given a real opportunity to review all asserted grounds of error and, if meritorious, to correct them by granting the motion for new trial.
The purpose, office, or function of a motion for a new trial has been variously stated to be to give the trial court an opportunity to correct its own errors, or errors that have occurred in the conduct of the trial or proceedings, without the delay, expense, inconvenience, or other hardships of an appeal; to bring before the court errors which, without the motion, would not be called to its attention; to direct the attention of the trial court to all errors not waived; to call to the court's attention errors that may have been committed during the trial, whether they are such as have been discovered since the trial or were committed in opposition to the moving party's contentions asserted at the trial; to secure the correction of errors by the court having such matters directly in hand, without the necessity of incurring the often heavy expense, the sometimes long delays, and the inconvenience, of appeals to a higher court; and to show to the appellate court that such opportunity for corrections was furnished. [Footnotes omitted]
Indeed, this Court has consistently held the necessity of giving a circuit judge an opportunity to correct trial errors so important that a litigant cannot complain on appeal of any perceived error that he did not first specifically point out to the circuit judge in a motion for a new trial. Mississippi State Highway Commission v. Rives, 271 So.2d 725 (Miss. 1972); Cooper v. Lawson, 264 So.2d 890 (Miss. 1972); T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481 (Miss. 1972); Mercier v. Davis, 234 So.2d 902 (Miss. 1970); Colson v. Sims, 220 So.2d 345 (Miss. 1969); Graham v. Swinney, 174 Miss. 579, 165 So. 438 (1934); Hayes v. Slidell Liquor Co., 90 Miss. 583, 55 So. 356 (1911); Armstrong v. Gaddis, 81 Miss. 35, 32 So. 917 (1902); Barney v. Scherling 40 Miss. 320 (1866).
This Court looks with favor upon a trial judge's rulings on a motion for a new trial, especially when granted. Mississippi State Highway Commission v. Hancock, 309 So.2d 867 (Miss. 1975); Houston v. Page, 208 So.2d 901 (Miss. 1968); Conner v. Hatcher, 203 So.2d 309 (Miss. 1967); Womble v. Mississippi State Highway Commission, 239 Miss. 372, 123 So.2d 235 (1960); Long v. Magnolia Hotel Co., 236 Miss. 655, 111 So.2d 645, sugg. error o'ruled 236 Miss. 655, 114 So.2d 667 (1959). And, except for an order directing a new trial on damages alone, in which instance an appeal is specifically authorized by statute, Miss. Code Ann. § 11-7-213, we have never permitted an appeal from an order granting a motion for a new trial. Woods v. Lee, 390 So.2d 1010, 1011 (Miss. 1980); Bowman v. Rutledge, 369 So.2d 768 (Miss. 1979); State v. Richardson, 350 So.2d 59 (Miss. 1977), (dismissing appeal from such an order on our own for lack of appellate jurisdiction); Byrd v. Sinclair Oil & Refining Co., 240 So.2d 623 (1970).
If Rule 5(a) of the Rules of the Mississippi Supreme Court authorizes this appeal, then the rule is meaningless as any brake on interlocutory appeals.
Human nature being what it is, it is not easy to recognize our own mistakes, and harder still to openly admit it. Thus, it is much simpler for a circuit judge to overrule a motion for a new trial and pass the case on to us. It is equally demonstrable that far fewer new trials are granted at the trial level than should be. Otherwise, why the substantial percentage of reversals of cases where motions for new trial have been denied? Yet historically we have with good reason encouraged trial judges to grant new trials when appropriate. If the trial judge should occasionally make an error in doing so, it can be corrected upon appeal from the second trial.
In this case we have a circuit judge who had the intelligence to recognize and courage to correct a mistake he considered he *319 made. He was doing the very thing we have pleaded with judges for two centuries to do when they considered a mistake had been made: order a new trial.
And, what do we do? Grant an interlocutory appeal and decide all issues in the case ourselves. Vanity, that psychological defense against the terror of extinction, has not passed over the judiciary. We publicize our erudition.
But what has happened to stability, or judicial economy?
And, we have just extinguished an endangered species, circuit judges intelligent enough to recognize their mistakes and courageous enough to correct them on their own.
My discomfort with this Court's abolition of settled principles governing interlocutory appeals has been expressed. Kilgore v. Barnes, 490 So.2d 895, 896 (Miss. 1986); Southern Farm Bureau Casualty Insurance Co. v. Holland, 469 So.2d 55, 60 (Miss. 1984). This case does not allay my apprehension.
DAN M. LEE, P.J., and SULLIVAN, J., join this opinion.
SULLIVAN, Justice, writing separately:

IS ASSUMPTION OF THE RISK A SEPARATE DOCTRINE UNDER COMPARATIVE NEGLIGENCE?
In 1917 the State of Mississippi adopted the doctrine of comparative negligence and codified it in the state code. See Hemingway's 1917 Mississippi Code § 502; Miss. Code Ann. (1930) § 511; Miss Code Ann. (1942) § 1454. This doctrine is presently stated in § 11-7-15, Miss. Code Ann. (1972), as Amended. This section states:
In all actions hereafter brought for personal injuries, or where such injuries have resulted in death, or for injury to property, the fact that the person injured, or the owner of the property, or person having control over the property may have been guilty of contributory negligence shall not bar a recovery, but damages shall be diminished by the jury in proportion to the amount of negligence attributable to the person injured, or the owner of the property, or the person having control over the property.
Since contributory negligence was no longer a bar to recovery this Court became plagued with another question:
Does the doctrine of assumption of the risk remain a viable and distinct alternative to comparative negligence? (i.e. should assumption of the risk be treated the same as contributory negligence under Mississippi's comparative negligence statute)?
Drawing a clear distinction between contributory negligence and assumption of the risk has always been difficult. Hill v. Dunaway, 487 So.2d 807, 810 (1986). In early cases assumption of the risk was seen as a complete bar to recovery while contributory negligence was almost like a lesser included offense. For assumption of the risk there had to be the element of "venturousness" but "carelessness" was all that was required for contributory negligence. Saxton v. Rose, 201 Miss. 814, 823, 29 So.2d 646, 649 (1947). The doctrines began to become muddled when jury instructions began to eliminate the distinction between assumption of the risk and contributory negligence. Wallace v. J.C. Penny Co., Inc., 236 Miss. 367, 372, 109 So.2d 876, 877-78 (1959). The Court struggled in numerous cases to keep the distinction between the two doctrines. Crouch v. Mississippi Power and Light, 193 So.2d 144, 146-47 (Miss. 1966); White v. Mississippi Power and Light Company, 196 So.2d 343, 351-53 (Miss. 1967); Shurley v. Hoskins, 271 So.2d 439, 443-44 (Miss. 1973).
As it became more difficult to maintain the distinction between assumption of the risk and contributory negligence the Court began to move away from assumption of the risk. The Court leaned away from assumption of the risk by stating that when there is uncertainty as to which is the proper legal theory, contributory negligence is favored. Braswell v. Economy Supply Co., 281 So.2d 669, 677 (Miss. 1973) (by favoring contributory negligence rather than the absolute bar of assumption of the *320 risk the party was still entitled to recover because of the comparative negligence statute, § 11-7-15). In Braswell the conflict was finally addressed by this Court. While assumption of the risk was not abolished by Braswell this Court further limited the use of the doctrine by stating that an assumption of the risk instruction should rarely be granted. Singleton v. Wiley, 372 So.2d 272, 274-75 (Miss. 1979). The Court's trend of removing assumption of the risk faltered in Nichols v. Western Auto Supply Co., Inc., 477 So.2d 261, 264-65 (Miss. 1985), but Braswell was distinguished, thereby leaving in place the framework for abolishing the doctrine of assumption of the risk. Nichols, while it stated that assumption of the risk is still viable, admitted that most jurisdictions refer to it as contributory fault. 477 So.2d at 264. So the case would still seem to support removal of assumption of the risk as a separate doctrine.
The movement away from assumption of the risk returned on track in Hill v. Dunaway. In a footnote in Hill this Court recognized the trend of moving assumption of the risk into the defense of contributory negligence. Hill, 487 So.2d at 810 n. 1. The footnote cited two cases and a law review article for support of the merger of assumption of the risk into the contributory negligence doctrine. The case Wilson v. Gordon, 354 A.2d 398, 402-03 (Maine 1976), cited in the Hill footnote listed nine states that had abolished the defense of assumption of the risk. Wilson stated that there were very few jurisdictions that believed assumption of the risk could exist with the doctrine of comparative negligence. In the other case cited in the Hill footnote Li v. Yellow Cab Company of California, 13 Cal.3d 804, 119 Cal. Rptr. 858, 532 P.2d 1226, 1240-42 (1975), the California Supreme Court stated that the adoption of a comparative negligence system should involve the merger of the doctrine of assumption of the risk since assumption of the risk is no more than a variant of contributory negligence. This Court stated in Hill that it was not the proper case for resolution of the issue but admitted that the comparative negligence rule serves the same purpose as assumption of the risk.
The Hill case brings the Court to where it is today, waiting for the right case to once and for all abolish the doctrine of assumption of the risk and treat all fault under the comparative negligence statute. Gaiennie is such a case. It is an example how even with the best intentions the doctrines of assumption of the risk and contributory negligence are still confused.
In this case the argument was made that Ritter had enough information prior to the flight to make his decision to fly "knowing and voluntary" thus qualifying for an assumption of the risk instruction. In reality a comparative negligence instruction was more appropriate to the facts since there was insufficient evidence to show that Ritter had enough weather information to make his decision to fly "knowing and voluntary". Despite the guidelines set forth in Braswell and Singleton limiting the use of the doctrine, an assumption of the risk instruction was given. This confusion shows that regardless of good intentions or the diligence of the judge as long as assumption of the risk continues to exist as a separate doctrine it will continue to be confused with the comparative negligence doctrine.
What should have been done in the case at bar was state that Ritter was careless as a pilot in accompanying Speakes on the flight without further investigation of the weather conditions. This carelessness should have been used to reduce any award or if the jury found this carelessness serious enough prohibit any award. Yet, because assumption of the risk is still a valid doctrine it was mentioned, which caused the judge to rethink his decision and grant a new trial.
If assumption of the risk had not been available as a separate doctrine prior to this trial the cost of a retrial could have been saved. The doctrine should be incorporated into the doctrine of contributory negligence and covered by Mississippi's comparative negligence statute, § 11-7-15. For no reason other than to alleviate further confusion when the doctrine is merged *321 the new concept should be titled comparative fault rather than comparative negligence. This new title would more properly reflect the purpose of the doctrine. When the plaintiff is partly at fault for the injuries he receives his recovery should be reduced and when the plaintiff is totally at fault his recovery should be barred.
I would so declare our law to be.
NOTES
[1] There were a number of other Defendants in the action below, in each of whose favor judgment has been entered summarily and become final.
[2] Compare Robbins v. Professional Construction Co., 72 Ill.2d 215, 222, 20 Ill.Dec. 577, 580, 380 N.E.2d 786, 789 (1978); Turner v. Commonwealth Edison Company, 63 Ill. App.3d 693, 698-99, 20 Ill.Dec. 499, 504, 380 N.E.2d 477, 482 (1978) (on interlocutory appeal from order granting new trial, appellate court will review entire case).
[3] As will appear below, final judgment must be entered exonerating Appellants Gaiennie, SIA and Memphis Aviation, Inc. We well recognize the conceptual difficulty with entering an adjudication on the merits affecting important rights of non-resident parties arguably not subject to in personam jurisdiction in the forum state. To the end that our disposition may be final and have res judicata effect, we hold, without discussion, that Gaiennie, SIA and Memphis Aviation, Inc. are each wholly subject to in personam jurisdiction in Mississippi for purposes of this action.
[4] A note regarding the basics may be of value. Before a court, any court, has authority to make an adjudication affecting the important rights of a non-resident (or any other party, for that matter), at least four distinct predicates must be established. In no particular order these are:

(1) The defendant must be amenable to suit in the forum state consistent with due process; that is, the defendant must have constitutionally adequate minimum contacts with the forum state. See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Administrators of the Tulane Educational Fund v. Cooley, 462 So.2d 696 (Miss. 1984). Though this imperative is largely a function of U.S. Const. Art. XIV, it may derive as well from the state's due process clause. Miss. Const. Art. 3, § 14 (1890). See Restatement (Second) of Conflict of Laws § 24 (1971).
(2) The defendant must have been accorded procedural due process consistent with the federal constitution; that is, he must have been given reasonable advance notice of the trial or hearing and a meaningful opportunity to be heard in response. See, e.g., Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950); Covington v. Covington, 459 So.2d 780, 782 (Miss. 1984). Again, this requirement emanates from the Due Process Clause of the Fourteenth Amendment. It may also be predicated upon the state's constitutional due process imperative. See Restatement (Second) of Conflict of Laws §§ 25, 26 (1971).
(3) The defendant must be amenable to suit here as a matter of state statutory law. See Restatement (Second) of Conflict of Laws § 35, Comment f (1971). Here we refer to such requirements in our law as those found in Miss. Code Ann. § 13-3-57 (Supp. 1986) (that defendant has made a contract to be performed here, committed a tort here, or done business here), § 11-31-1 (Supp. 1986) (that defendant has property here), etc. A state's long arm statute need not necessarily extend to the federal constitutional outer limits of state power.
(4) The defendant must have been served with process in conformity with the requirements of a procedural rule prescribing the manner of service of process. Most prominent here is Rule 4, Miss.R.Civ.P.
Each of these requisites is independent of the other three. All four must be satisfied before a court of the forum state may do anything that affects the important rights of the defendant and that is entitled to enforcement in the forum state or to full faith and credit elsewhere. Only (1) and (3) are challenged on this appeal, and our discussion above is so limited.
Conceptually, the state constitutional due process analogies to International Shoe and Mullane, Inquiries Nos. (1) and (2) above may be more like Inquiries Nos. (3) and (4). There is nothing that would prohibit our holding that our due process clause, Miss. Const. Art. 3, § 14 (1890), affords non-resident defendants greater rights and protections than are found in International Shoe and Mullane and progeny. See Michigan v. Long, 463 U.S. 1032, 1037, 1040, 103 S.Ct. 3469, 3474, 3476, 77 L.Ed.2d 1201, 1212, 1214-15 (1983); Pruneyard Shopping Center v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040-41, 64 L.Ed.2d 741, 752 (1980). In fact, we have given our due process clause no such construction and in several contexts have held that it should be construed identically with federal due process requirements. Mississippi Power Co. v. Goudy, 459 So.2d 257, 261-62 (Miss. 1984); N.C.A.A. v. Gillard, 352 So.2d 1072, 1081 (Miss. 1977); Walters v. Blackledge, 220 Miss. 485, 515, 71 So.2d 433, 444 (1954). We have in dicta suggested (arguably incorrectly at the time  or even now!) that this state's long arm reaches as far as the federal constitution allows. Breckenridge v. Time, Inc., 253 Miss. 835, 842, 179 So.2d 781, 783 (1965); Mladinich v. Kohn, 250 Miss. 138, 147, 164 So.2d 785, 789 (1964).
[5] See Smith, Choice of Law in the United States, 38 Hastings L.J. 1041, 1090-91 (1987); but see Selder, Rules of Choice of Law Versus Choice of Law Rules: Judicial Method in Conflicts Torts Cases, 44 Tenn.L.Rev. 975, 1009-12 (1977).
[6] We have accepted and enforced the Restatement's issue by issue approach. Boardman v. United Services Automobile Assoc., 470 So.2d 1024, 1031 (Miss. 1985); Vick v. Cochran, 316 So.2d 242, 246 (Miss. 1975); Fells v. Bowman, 274 So.2d 109, 112 (Miss. 1973).
[7] The provision relied upon by the plaintiffs for the proposition that federal law imposes vicarious liability upon the lessors, bailors and owners of aircraft is contained in the "definitions" section of the Act and reads as follows:

"Operation of aircraft" or "operate aircraft" means the use of aircraft, for the purpose of air navigation and includes the navigation of aircraft. Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control (in the capacity of owner, lessee, or otherwise) of the aircraft, shall be deemed to be engaged in the operation of aircraft within the meaning of this chapter.
49 U.S.C.A. § 1301(26).
Many state statutes regarding the regulation of aircraft are modeled after this federal act. See e.g. Miss. Code Ann. § 61-1-3(j) (1972) (identical to Section 1301(26)). Plaintiffs place reliance upon an opinion of the United States Court of Appeals for the Fifth Circuit construing this definition of "operator" to impose statutory vicarious liability upon owners and bailors of aircraft. Hays v. Morgan, 221 F.2d 481, 483 (5th Cir.1955) (construing predecessor to section 61-1-3(j)). Subsequent cases, however, have criticized the rationale employed in Hays and the holding has since been limited by the Fifth Circuit. That court now considers the holding but a reading of Mississippi statutory law and has declined to extend the rationale to the identically worded federal counterpart. Rogers v. Ray Gardner Flying Service, Inc., 435 F.2d 1389, 1393-94 (5th Cir.1970). As Tennessee law governs, we have no occasion to resolve the point.
[8] The record in this case reflects that Speaks' first marriage had not yet legally terminated, as he was scheduled to execute an instrument of final divorce upon his return from Missouri. We take no position nor do we make any comment upon the legal rights of Speaks' survivors.
[9] Mississippi law is like Tennessee's.

If a servant steps aside from the master's business for some purpose of his own disconnected from his employment, the relation of master and servant is temporarily suspended and "this is no matter how short the time, and the master is not liable for his acts during such time."
Persons v. Stokes, 222 Miss. 479, 486, 76 So.2d 517, 519 (1954).
This rule, borrowed from the tort principle of respondeat superior, obtains in the area of workers' compensation as well. Collier v. Texas Construction Co., 228 Miss. 824, 828, 89 So.2d 855, 857 (1956); Earnest v. Interstate Life & Accident Ins. Co., 238 Miss. 648, 652, 119 So.2d 782, 783 (1960). Thus, deviations from that which is necessary to carry the worker to and from business events are not within the reach of the act. Dowdle & Pearson, Inc. v. Dep. of Hargrove, 222 Miss. 64, 69, 75 So.2d 277, 278 (1954); see Dunn, Mississippi Workers' Compensation, § 171 (3d ed. 1982). See generally Restatement (Second) of Conflict of Laws § 183 (1971).
[10] Defendants argue Plaintiffs may not complain as the assumption of risk instruction given the jury was the one drafted and submitted by Plaintiffs' counsel. They ignore our long standing policy that, when the trial court makes a ruling adverse to a litigant, that litigant and his lawyer are entitled to try the rest of the case on the assumption that the trial judge's ruling will not be disturbed on appeal. When that litigant reaches this Court, we will not imply a waiver from subsequent conduct which does nothing more than show the lawyer's obligatory respect for the trial judge while at the same time continuing as best she can to advance her client's cause. Stringer v. State, 500 So.2d 928, 946 (Miss. 1986); Stong v. Freeman Truck Line, Inc., 456 So.2d 698, 711 (Miss. 1984); Home Insurance Co. of New York v. Dahmer, 167 Miss. 893, 901, 150 So. 650, 652 (1933). As this policy is in the nature of local procedure, we may enforce it, notwithstanding the choice of law principles articulated above.
[11] This is as good a point as any to note that Mitchell v. Craft did not declare the place of the accident irrelevant in the choice of law inquiry. The law of that state still controls the rights and liabilities of the parties, unless, with respect to the issue at hand, some other state has a more significant aggregate relationship. Restatement (Second) of Conflict of Laws § 146 (1971).
[12] The Mississippi rules regarding assumption of risk seem identical to Missouri's and Tennessee's. Nichols v. Western Auto Supply Co., 477 So.2d 261, 264 (Miss. 1985); Elias v. New Laurel Radio Station, Inc., 245 Miss. 170, 179, 146 So.2d 558, 561-62 (1962).
[13] In Restatement parlance we act by reference to the "relevant policies of the forum" and the "basic policies underlying the particular field of law." Restatement (Second) of Conflict of Laws § 6(2)(b) and (e) (1971). Prof. Robert A. Leflar's more brazen form of expressing the point would be that we enforce our comparative negligence rule because it is a "better rule of law", cited in Mitchell, 211 So.2d at 514; see Leflar, Conflicts Law: More on Choice-Influencing Considerations, 54 Calif.L.Rev. 1584, 1587 (1966); see also Hill, The Judicial Function in Choice of Law, 85 Colum.L.Rev. 1585, 1618-19 (1985).
[14] We can but confess Tennessee appears to take a different view. See Patterson v. Smith, 57 Tenn. App. 673, 424 S.W.2d 204, 208 (1965), which enforced our comparative negligence statute, notwithstanding Tennessee's contributory negligence rule. Perhaps the Tennessee courts similarly recognize that comparative negligence is the better rule, believing only that implementation of the new regime is not within the judicial prerogative. See Street v. Calvert, 541 S.W.2d at 586; Arnold v. Hayslett, 655 S.W.2d at 945 n. 4.
[15] Prosser and Keeton, The Law of Torts § 67 (5th ed. 1984); Schwartz, Contributory and Comparative Negligence: A Reappraisal, 87 Yale L.J. 697, 721-27 (1978).
[16] Rubinfeld, The Efficiency of Comparative Negligence, 16 J.Legal Stud. 375 (1987).