IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 92-7378

---

EARL WAYNE COATS,

                                    Plaintiff-Appellee,
                                    Cross-Appellant,

versus

PENROD DRILLING CORPORATION,
ET AL.,

                                    Defendants,

PENROD DRILLING CORPORATION, and
HYTORC, M.E.,

                                    Defendants-Appellants,
                                    Cross-Appellees.

---

Appeal from the United States District Court
for the Southern District of Mississippi

---

(October 18, 1993)

Before KING, HIGGINBOTHAM, and DEMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This is a maritime personal injury suit filed by a United States citizen against his employer, a corporation formed under the law of the United Arab Emirates, and the owner and operator of a jack-up drilling rig, a Delaware corporation with its principal place of business in Dallas, Texas. Plaintiff was injured aboard the rig off the coast of the United Arab Emirates. Under the general maritime law of the United States, a jury determined that the rig was unseaworthy, that its owner and plaintiff's employer

were negligent, and awarded substantial damages. The employer appeals the district court's denial of its motion to dismiss for lack of personal jurisdiction, the application of American law, and the failure to dismiss based on forum non conveniens. The defendant appeals, urging us to abolish or modify the doctrine of joint and several liability in the context of comparative fault as well as reverse the district court's application of American law. Plaintiff cross-appeals the court's ruling that he was not a Jones Act seaman, the sufficiency of the evidence to support the jury's finding of contributory negligence, the directed verdict for defendants denying punitive damages under the general maritime law, the denial of prejudgment interest, and the amount of costs awarded. We affirm.

I.

MIS is a corporation organized under the laws of Ras Al-Khaimah, United Arab Emirates with branch offices in Dubai and Abu Dhabi. It performs repair and maintenance services for oilfield and marine vessels, and its employees are all expatriates, primarily from India, Pakistan, and the United States. MIS uses Lee's Materials Services, Inc. in Houston, Texas to perform various services in the United States. Through Lee's, MIS advertised its job openings in the Houston Chronicle (Texas), Lafayette Advertiser (Louisiana), and Mobile Register (Alabama). During his trip, Shelton held a meeting in Laurel, Mississippi that was attended by several young men, including the plaintiff, Earl Wayne Coats.

2

Shelton explained that he was soliciting employees to operate MIS equipment on certain offshore vessels.

In 1987, David Shelton, manager of the Hytorc Division of Maritime Industrial Services, travelled from the United Arab Emirates to Mississippi on vacation and to interview prospective employees for MIS. At the meeting, Shelton offered a job to Coats, and Coats accepted. Their agreement included thirty days per year of paid vacation with airfare back to Mississippi. MIS also promised to pay for Coats' return to Mississippi at the termination of his employment. The term of Coats' employment was indefinite. Coats obtained an updated passport as instructed by Shelton, and MIS, through Lee's Materials, sent him a plane ticket to Dubai. Coats arrived in the United Arab Emirates and started work on December 1, 1987.

While working for MIS, Coats lived on shore and worked on various jack-up rigs owned by different customers of MIS. The majority of Coats' work consisted of operating a hydraulically powered torque wrench used to loosen and tighten large nuts and bolts. During Coats' employment with MIS, Penrod Drilling Corporation, a Delaware corporation with its principal place of business in Dallas, Texas contracted for MIS to perform pressure testing on Penrod's Rig 69. The pressure testing was necessary to prepare the rig for its next drilling operation. At the time, Rig 69, a jack-up drilling rig, was located in the Port of Mina Saqr in the territorial waters of the United Arab Emirates. It was twenty feet from shore in forty feet of water and connected to land by a

3

gangway.  Rig 69 flies the United States flag, and its home port is New Orleans, Louisiana.  Penrod maintained a local office in the United Arab Emirates to assist in the operation of Rig 69.

MIS assigned Coats to perform the pressure testing for Penrod.  Coats was inexperienced at this task and had to ask for assistance from Penrod personnel.  As Coats was working aboard Rig 69, Penrod's "bullplug" failed at a pressure less than it was rated to withstand, causing the fluid under pressure to erupt.  The eruption knocked Coats down, resulting in a severe and disabling injury to his knee.  After the accident, MIS flew Coats to Hattiesburg, Mississippi for treatment and started paying his medical expenses.  Most of these payments were made through Lee's Materials.  Meanwhile, MIS filled Coats' job with Chris Stennett, another Mississippi resident who attended Shelton's meeting in Laurel.

On April 10, 1989, Coats sued Penrod, MIS, and Lee's[1] in the Southern District of Mississippi.  The complaint asserted federal jurisdiction based on diversity of citizenship and admiralty and alleges, inter alia, negligence on the part of Penrod and MIS, the unseaworthiness of Rig 69, and entitlement to maintenance and cure from MIS under the Jones Act.  Soon thereafter, MIS terminated its payment of benefits to Coats.  Coats then amended his complaint against MIS to seek compensatory and punitive damages under the general maritime law for wrongful termination of maintenance and cure and to allege wrongful termination of health insurance

_____

[1]The district court granted Lee's motion for summary judgment and dismissed it from the case.

4

benefits under ERISA. Penrod cross-claimed against MIS for indemnity and contribution under the general maritime law.

Before trial, the district court issued a number of orders in response to motions filed by the parties. The court ruled that MIS had sufficient contacts with Mississippi to justify the assertion of personal jurisdiction and that it would apply United States law, rather than the law of the United Arab Emirates, to Coats' personal injury claims. Under American law, the court determined that Coats was not a Jones Act seaman, and therefore not entitled to maintenance and cure damages, but that Coats qualified as a Sieracki seaman with the attending right to sue under the warranty of seaworthiness. See Seas Shipping Co. v. Sieracki, 328 U.S. 85 (1946).[2] The court also declined to dismiss the case under the doctrine of forum non conveniens.

The case proceeded to trial on Coats' claims against Penrod for negligence and unseaworthiness and against MIS for negligence, wrongful termination of maintenance and cure, and wrongful termination of benefits under ERISA. After the court directed a verdict against Coats on his claim for punitive damages based on MIS' termination of maintenance and cure, the jury returned a verdict for Coats, assessing damages of $925,000 and assigning 20% fault to Coats, 20% to Penrod, and 60% to MIS. The court reduced the award by Coats' comparative fault to $740,000 and entered

---

[2]The court also dismissed Coats' claims under the Longshore and Harbor Workers' Compensation Act because Coats' injuries did not occur "upon navigable waters of the United States." 33 U.S.C. § 905(b).

judgment against Penrod and MIS jointly and severally.[3]  The court also awarded costs to Coats in the amount of $7,889.04.  All parties appealed.

## II.

## A.

We first address the issue of personal jurisdiction over MIS, a question that requires us to apply Mississippi's long-arm statute.  See DeMelo v. Toche Marine, Inc., 711 F.2d 1260 (5th Cir. 1983).[4]  MIS contends that the Mississippi statute does not confer

---

[3]In an advisory capacity, the jury determined that MIS terminated Coats' medical benefits with the specific intent to discriminate against Coats in violation of ERISA.  The court adopted this finding and entered judgment for Coats on his ERISA claims in the amount of $26,524.82, less a credit for $23,335.15 in medical expenses previously paid by MIS to Coats.  This judgment was not appealed.

[4]At the time this suit was filed, § 13-3-57 provided:

Any non-resident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or non-resident of this state, or who shall do any business or perform any character of work or service in this state shall by such act or acts be deemed to be doing business in Mississippi.  Such acto or acts shall be deemed equivalent to the appointment by such nonresident of the secretary of state of the State of Mississippi, or his successor or successors in office, to be the true and lawful attorney or agent of such nonresident upon whom all lawful process may be served in any actions or proceedings accrued or accruing from such act or acts, or arising from or growing out of such contract or tort, or as an incident thereto, by any such nonresident or his, their, or its agent, servant or employee.
. . .

Miss. Code Ann. § 13-3-57 (Supp. 1988) (amended 1991).

6

jurisdiction, and alternatively, that applying the statute to MIS violates due process.[5]  The relevant facts are undisputed, and thus our review of this issue is <u>de novo</u>.  <u>Command-Aire Corp. v. Ontario Mechanical Sales and Serv. Inc.</u>, 963 F.2d 90, 93 (5th Cir. 1992).

Because Coats' claims are not based on contract and the alleged tortious conduct of MIS occurred in the United Arab Emirates, the district court asserted personal jurisdiction over MIS under the catchall or "doing business" prong of the Missisippi statute. <u>See</u> <u>Jones v. Chandler</u>, 592 So. 2d 966, 971 (Miss. 1991) (referring to "doing business" as the catchall provision).[6]  The first question is whether MIS was "doing business" in Mississippi.[7]

_____

[5]We must address both arguments separately, because the Mississippi courts have not held that the state's long-arm statute reaches to the limits allowed by the Constitution.  <u>See</u> <u>Rittenhouse v. Mabry</u>, 832 F.2d 1380, 1383 (5th Cir. 1987); <u>Southern Pac. Transportation Co. v. Fox</u>, 609 So.2d 357, 365 (Miss. 1992) (Lee, P.J., dissenting).

[6]The district court found it unnecessary to decide whether MIS' termination of Coats' maintenance and cure benefits constituted an intentional tort committed in whole or in part in Mississippi.  We also decline to address this issue.

[7]The district court applied a three-pronged test for "doing business" that originated in <u>Mladinich v. Kohn</u>, 164 So. 2d 785, 790 (Miss. 1964): (1) the non-resident defendant must purposefully do some act or transaction in Mississippi, (2) the cause of action must be connected to or arise from this transaction, and (3) the assumption of jurisdiction must not offend traditional notions of fair play and substantial justice. <u>See also</u> <u>Rittenhouse v. Mabry</u>, 832 F.2d 1380, 1385 (5th Cir. 1987) (applying this test); <u>Aycock v. Louisiana Aircraft, Inc.</u>, 617 F.2d 432, 434 (5th Cir. 1980) (same).  This is also the analysis employed by the parties on appeal.  The two most recent decisions from the Mississippi Supreme Court on this issue, however, did not apply this test, but instead focused on the

Under the statute, one is "deemed to be doing business" if he "perform[s] any character of work or service in this state." Miss. Code Ann. § 13-3-57. In <u>McDaniel v. Ritter</u>, 556 So. 2d 303 (Miss. 1989), the Mississippi Supreme Court further defined the term to include doing "various acts here for the purpose or realizing a pecuniary benefit or otherwise accomplishing an object." <u>Id</u>. at 309 (citing Restatement (Second) of Conflict of Laws § 35 cmt. a (1971)). The Mississippi Supreme Court recently stated that the doing business prong "is so broad that it belies any suggestion it be limited to commercial activity." <u>Jones</u>, 592 So. 2d at 971.

MIS' recruitment and hiring of employees in Mississippi meets the Restatement definition adopted by the Mississippi Supreme Court. MIS performed various acts in Mississippi to recruit Coats. Shelton, on behalf of MIS, held a meeting in Laurel. At that meeting, MIS hired Coats -- and under terms that contemplated future contacts with Mississippi. MIS agreed to fly Coats back to Mississippi every year of his employment for his thirty-day vacation, and MIS employed Coats for an indefinite term. When Coats was injured, MIS returned him to Mississippi for treatment and started paying for his medical expenses. Moreover, Coats was not the only Mississippi resident MIS recruited and hired. After Coats' accident, MIS replaced him with Chris Stennett, another

---

actual language of the long-arm statute. <u>See</u> <u>Southern Pac. Transportation Co. v. Fox</u>, 609 So. 2d 357 (Miss. 1992); <u>McDaniel v. Ritter</u>, 556 So. 2d 303 (Miss. 1989). Although we do not infer a substantive change in the law from these decisions, we will follow the most recent guidance from the state's highest court.

Mississippi resident who attended Shelton's meeting in Laurel. MIS also advertised its job openings in newspapers from three neighboring states, and there is evidence in the record that these newspapers are distributed to Mississippi residents. Cf. Rittenhouse, 832 F.2d at 1385 (finding a failure to meet the "doing business" requirement while noting that the defendant did not solicit patients from Mississippi or advertise there). These actions constitute "various acts [in Mississippi] for the purpose or realizing a pecuniary benefit or otherwise accomplishing an object."

Concluding that MIS does business in Mississippi is not by itself sufficient to establish jurisdiction. The nexus requirement must also be met. That is, the "act or acts" performed by MIS in Mississippi will confer jurisdiction only "in any actions or proceedings accrued or accruing from such act or acts . . . or as an incident thereto . . . ." Miss. Code Ann. 13-3-57 (emphasis added).[8] As explained by the Mississippi Supreme Court,

> [t]he long-arm statute requires no direct nexus to the non-resident's business done here, only that the claim be incident thereto. The statute thus requires far less than that the liability generating conduct have occurred in Mississippi.

McDaniel, 556 So.2d at 309; see also Southern Pac. Transp. Co. v. Fox, 609 So. 2d 357, 360 (Miss. 1992). McDaniel was a wrongful death action arising from a plane crash in Missouri. Jack Ritter,

---

[8]Effective July 1, 1991, the Mississippi legislature amended § 13-3-57 and repealed the nexus requirement. The amended statute applies prospectively to actions commenced after its effective date and therefore has no effect on Coats' suit, filed in 1989. Southern Pac. Transp. Co. v. Fox, 609 So. 2d 357, 360 n.5 (Miss. 1992).

plaintiffs' decedent, and Alton Jerry Speaks, defendants' decedent, were killed in the accident. Ritter was a Mississippi resident, and Speaks resided in Tennessee. The two men worked for Consolidated Enterprises, a Mississippi corporation with an office in Columbus. Speaks had organized the company and was its principal shareholder. Most important, they were travelling on behalf of Consolidated when the plane crashed. After concluding that Speaks had a continuing and substantial presence in Mississippi, the court held that plaintiffs' claim arose from "facts sufficiently incident to business done by Speaks in Mississippi" to satisfy the long-arm statute. 556 So. 2d at 309. Although the crash occurred in Missouri and the plane never travelled through Mississippi, the fact that they were travelling on behalf of the defendant's corporation which was doing business in Mississippi furnished the required nexus. See id.

In Fox, the court found the required nexus lacking on facts it characterized as "in sharp contrast with McDaniel." 609 So. 2d at 361. Fox, a Texas resident, sued his employer, Southern Pacific Transportation Co., to recover for injuries suffered while working in Southern Pacific's railroad yard in Hearne, Texas. Southern Pacific's principal place of business was Lafayette, Louisiana. Although Southern Pacific did transport goods through Mississippi in interstate commerce, critical to the court was the fact that neither Fox nor his accident had "even the slightest connection with this state or with any business Southern Pacific does here." Id. at 359.

10

We are persuaded that Coats' claims arise from facts sufficiently incident to MIS's activities in Mississippi to meet the nexus requirement for personal jurisdiction under Mississippi law.  MIS held a meeting in Mississippi and recruited Coats to come work for them.  This contact with Mississippi resulted in Coats' employment and Coats was injured on the job.  Moreover, Coats claims damages, in part, as compensation for his medical expenses while in a Mississippi hospital, where MIS flew him for treatment.  Finally, MIS terminated its payment of Coats' medical expenses while Coats was hospitalized in Mississippi.

B.

Due process requires that a defendant have sufficient minimum contacts with the forum state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.  International Shoe Co. v. Washington, 326 U.S. 312, 316 (1945).  The nature and quality of these contacts must justify the conclusion that defendant should have reasonably anticipated being haled into court in the forum state.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980); Jones v. Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1068 (5th Cir. 1992).  As an analytic device, the Supreme Court draws a distinction between specific and general jurisdiction.  See Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174, 2182 (1985); Helicopteros Nacionales de Colombia, S.A. v. Hall, 104 S.Ct. 1868, 1872 (1984).  For specific jurisdiction, the defendant must have purposely directed his activities at the resident of the forum and, the litigation must

11

result from the alleged injuries that arise out of or relate to the defendant's activities directed at the forum.  <u>Burger King</u>, 471 U.S. at 474; <u>Aviles v. Kunkle</u>, 978 F.2d 201, 204 (5th Cir. 1992). The focus is on the relationship between the defendant, the forum, and the litigation.  <u>Burger King</u>, 471 U.S. at 474.  "The appropriate inquiry is whether the defendant purposefully availed [itself] of the privilege of conducting activities in-state, thereby invoking the benefits and protections of the forum state's laws."  <u>Bullion v. Gillespie</u>, 895 F.2d 213, 216 (5th Cir. 1990) (citing <u>Burger King</u>, 471 U.S. at 474-75).  Where the cause of action is not related to or does not arise from the defendant's activities in the forum, the forum may still have general jurisdiction if the defendant's contacts with the forum are of a continuous and systematic nature.  <u>Helicopteros</u>, 466 U.S. at 414-15.  We hold that the exercise of personal jurisdiction over MIS satisfies the Constitution under the specific jurisdiction analysis.

MIS could reasonably anticipate being haled into court in Mississippi as a result of its relationship with Coats.  MIS' recruitment activities in Mississippi that led to his hiring, such as holding a meeting in the state and buying ads in papers that circulated in the state, are the sort of "reach[ing] out" to Mississippi that the Supreme Court saw as creating personal jurisdiction in <u>Burger King</u>, 105 S.Ct. at 2186.  <u>See also</u> <u>Pedelahore v. Astropark</u>, 745 F.2d 346, 349 (5th Cir. 1984).  MIS

further cemented that bond by signing a contract obligating it to return Coats there once a year for as long as he worked for MIS.

Then, after Coats' injury, he and MIS jointly decided that he would return to Mississippi for treatment.[9] MIS flew him there and began paying his medical bills. Flying an employee to Mississippi and assuming a financial obligation there is not a "random," "fortuitous," or "attenuated" act that is an improper basis of jurisdiction. See Burger King, 105 S.Ct. at 2186. Backing out of that commitment, an act that ultimately cost MIS over $20,000 in the judgment below, was also a choice by MIS that could lead it to foresee appearing in a Mississippi court. See Bearry v. Beech Aircraft, 818 F.2d 370, 375 (1987); Thompson v. Chrysler Motors, 755 F.2d 1162, 1172 (5th Cir. 1985).

Once minimum contacts are shown, a court should decide whether the assertion of jurisdiction would comport with fair play and substantial justice, considering the burden on the defendant, the

---

[9]Coats testified in his deposition that once it was determined that his injury required surgery:

> He [Mr. Shelton] first suggested that I would fly to Houston. They would do surgery on me in Houston there. He would have me met by members of his family. I would be transported to a hospital. He said he could take care of all the arrangements.

Then Shelton changed his mind and offered Coats another choice:

> [T]he following day he had mentioned to me that if I was going to be in the hospital for so long, that it would be very expensive for my family to have to come to Houston to see me and stay there; that if there was anywhere in Mississippi that I would like to have the surgery done, he could arrange it where I could be transported to Mississippi.

13

forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. Burger King, 105 S. Ct. at 2184. Requiring MIS to defend this suit in Mississippi would not offend these principles. Coats is a resident of Mississippi, and Mississippi has a strong "interest in providing effective means of redress of its residents." McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957); see also Holt, 801 F.2d at 780; Pedelahore, 745 F.2d at 349. It was not unreasonably inconvenient to require MIS to defend a suit in Mississippi given that many of its employees are American. See Burger King, 105 S. Ct at 2184 ("[t]hese considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required").

III.

A.

Turning to the district court's application of United States law, MIS first argues that the choice of law is between the law of the United Arab Emirates and Mississippi law, rather than the general maritime law. This conclusion rests on the contention that the district court lacked subject matter jurisdiction in admiralty, and therefore, the only basis for federal jurisdiction is diversity. If so, the district court should have applied

14

Mississippi's choice of law rules in deciding between foreign and state law.  See Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 496 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).[10]  MIS asserts that Mississippi would apply the law of the United Arab Emirates to this case.[11]

MIS argues that the activity giving rise to Coats' accident does not have a sufficient connection to traditional maritime activity to support admiralty tort jurisdiction.  See Sisson v. Ruby, 110 S. Ct. 2892 (1990); Foremost Ins. Co. v. Richardson, 102 S.Ct. 2654 (1982);  Executive Jet Aviation v. Cleveland, 409 U.S. 249 (1972).  In this circuit, we examine four factors to determine the relationship to maritime activity: (1) the functions and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type injury; and (4) traditional concepts of the role of admiralty law.  Kelly v. Smith, 485 F.2d 520, 525 (5th Cir. 1973).  Our analysis today is further guided by the Supreme Court's recent pronouncement in Sisson.  See also Broughton Offshore Drilling v. South Central Machine, Inc., 911 F.2d 1050, 1052 & n.1 (5th Cir. 1990) (applying Kelly after noting

_____

[10]Mississippi follows the Restatement Second approach which requires application of the law of the place of injury, absent a more significant relationship with another state.  Mitchell v. Craft, 211 So. 2d 509, 515 (Miss. 1968).

[11]Penrod has not joined MIS in this argument, apparently because Penrod's claim for  contribution or indemnity against MIS is based on general maritime law.  If the law of the United Arab Emirates is not applicable, Penrod may prefer to have general maritime law apply rather than Mississippi law.

that <u>Sisson</u> recognized but neither approved nor disapproved our approach).

Applying the first factor, the functions and roles of the parties, MIS performs repair and maintenance services for oilfield and marine vessels. Penrod is engaged in offshore oil drilling. Penrod contracted with MIS, because Rig 69 needed pressure testing before its next drilling operation. Because "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce," the Supreme Court has considered the effect of an activity on maritime commerce. <u>Foremost</u>, 102 S. Ct. at 2658; <u>Sisson</u>, 110 S. Ct. at 2895; <u>see also</u> <u>Exxon Corp. v. Central Gulf Lines, Inc.</u>, 111 S. Ct. 2071, 2074 (1991). The repair and maintenance of a jack-up drilling rig on navigable waters is certainly a maritime activity with an effect on maritime commerce.

The second factor is the types of vehicles and instrumentalities involved. Coats' injury occurred aboard a vessel on navigable water which strengthens the nexus with traditional maritime activity. That Coats was operating MIS equipment aboard Rig 69 does not diminish the importance of a ship-board injury.

As to the causation and type of injury, the third factor, MIS refers to the fact that Coats was injured while pressure testing, and the cause of the accident was the failure of Penrod's bullplug. These events, MIS contends, could just have easily occurred on land. Moreover, according to MIS, its negligent failure to train Coats in pressure testing bears no special relation to maritime activities. We are not persuaded that these facts could overcome

16

the otherwise substantial connection with maritime activity. In any event, this factor is entitled to little weight after <u>Sisson</u>, where the Court refused to engage in this sort of detailed inquiry into causation. That case involved a fire that began on a noncommercial vessel at a marina on a navigable waterway. Before judging the nexus with traditional maritime activity, the Court first had to determine the relevant activity involved. As the Court explained,

> Our cases have made clear that the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose . . . This focus on the general character of the activity is, indeed, suggested by the nature of the jurisdictional inquiry. Were courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question.

110 S. Ct. at 2897. Declining to ascertain the precise cause of the fire, the Court determined the relevant activity to be "the storage and maintenance of a vessel at a marina on navigable waters." Similarly, the relevant activity in this case is the repair and maintenance of a jack-up drilling rig on navigable waters.

Traditional concepts of the role of admiralty, the final factor, also support admiralty jurisdiction. This case arises from a tort that occurred aboard a vessel on navigable waters. One of the traditional roles of admiralty law is to provide compensation for injuries aboard ship. <u>See</u> <u>Sisson</u>, 110 S. Ct. 2898-02 (Scalia, J., concurring) (arguing that all vessel-related torts fall within the admiralty jurisdiction).

17

MIS's reliance on <u>Sohyde Drilling & Marine Co. v. Coastal Gas Producing Co.</u>, 644 F.2d 1132 (5th Cir. 1981), is misplaced. There, we applied the <u>Kelly</u> factors and concluded that admiralty jurisdiction was lacking in a suit for property damage arising from the blowout of a high-pressure gas well located in a dead-end canal slip in Louisiana. Coastal, the operator of the well, had hired Sohyde to perform workover operations to correct a loss of production. Critical to the court's decision was its distinction between property damage and personal injury. While denying jurisdiction over the property damage at issue, the court remarked that claims for personal injury suffered on navigable waters would certainly fall within admiralty. <u>Id</u>. at 1136-37; <u>see also</u> <u>Broughton</u>, 911 F.2d at 1052.[12] Therefore, <u>Sohyde</u> actually supports the exercise of admiralty jurisdiction in this case, one involving only personal injury. MIS's arguments are without merit.

B.

Because this is an admiralty case, the <u>Lauritzen</u>-<u>Rhoditis</u> factors govern the choice of law: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured worker; (4) the allegiance of the defendant shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations. <u>Hellenic Lines, Ltd. v. Rhoditis</u>, 398 U.S. 306, 308-09

---

[12]<u>Sohyde</u> has been criticized for its distinction between property damage and personal injury, and we have vowed not to extend it beyond its facts. <u>Broughton</u>, 911 F.2d at 1053. <u>See also</u> <u>Houston Oil and Materials Corp. v. American Int'l Tool Co.</u>, 827 F.2d 1049, 1054 (5th Cir. 1987).

(1970); Lauritzen v. Larsen, 345 U.S. 571, 583-91 (1953). "The test is not a mechanical one in which the court simply counts the relevant contacts; instead, the significance of each factor must be considered within the particular context of the claim and the national interest that might be served by the application of United States law." Fogleman v. Aramco, 920 F.2d 278, 282 (5th Cir. 1991). The type of vessel involved in this case, a jack-up oil drilling rig, is particularly relevant to our analysis. "The significance of each factor in a nontraditional maritime context like offshore oil production may vary from that in the traditional shipping context in which the Lauritzen-Rhoditis test arose." Id.; see also Bailey v. Dolphin Int'l, Inc., 697 F.2d 1268, 1275 (5th Cir. 1983) (jack-up drilling rig); Cuevas v. Reading & Bates Corp., 770 F.2d 1371 (5th Cir. 1985) (same); Jack L. Albritton, Choice of Law in a Maritime Personal Injury Setting: The Domestic Jurisprudence, 43 La. L. Rev. 879 (1983) (discussing the difference between "bluewater" and "brownwater" cases). The place of the wrongful act, the allegiance or domicile of the injured, and the place of the contract, which are less important in the shipping context, are more significant in nontraditional cases such as this one. Chiazor v. Transworld Drilling Co., 648 F.2d 1015, 1019 (5th Cir. 1981). Our review of the district court's decision to apply United States law is de novo. E.g. Fogleman, 920 F.2d at 282.

The first factor is the place of the wrongful act. Coats' accident occurred in the territorial waters of the United Arab

Emirates, and because this is a nontraditional maritime case, this factor is entitled to considerable weight.

The second factor is the law of the flag. "The law of the flag has traditionally been of cardinal importance in determining the law applicable to maritime cases." Id. (citing Lauritzen, 345 U.S. at 583-84). MIS is not a shipowner and therefore this factor has no specific application to it. Penrod's Rig 69 flew the United States flag. Penrod argues that the flag of the vessel in this case is fortuitous, because Coats was assigned to six different drilling rigs with different owners and allegiances. the record indicates that in addition to the PENROD 69, Coats worked aboard the MARESK VICTORY, the TRIDENT III, the TRANSOCEAN V, the W.T. ADAMS, and the SEDCO 91. Penrod, however, does not say what flag each of these vessels flew and we are unable to find this information in the record. We cannot concluded that Coats' injury aboard a United States flagged vessel, as opposed to a vessel registered in another country, was fortuitous without knowing what flag these other rigs flew.

The third factor is the allegiance or domicile of the plaintiff, and one that gains added significance in this context. Coats is a United States citizen, and despite his move overseas, he maintained his residence in Mississippi. That is where MIS agreed to fly him for his vacations, and that is where he returned after the accident. Nevertheless, defendants contend that Coats' domicile was in the United Arab Emirates. They argue that he moved to that country with the intent to remain, because his job with MIS

20

was for an indefinite term and one is generally domiciled where he works. In _Fogleman_, however, the plaintiff was a Louisiana resident who had worked in Saudi Arabia for eight years, and we determined his domicile to be in the United States. Therefore, Coats is, _a fortiori_, domiciled in the United States.

Fourth is the allegiance of the defendant shipowner. Penrod's allegiance is without question to the United States. Rig 69 flies the United State flag and Penrod's principal place of business is Dallas, Texas. MIS is not a shipowner, but we still take into account its organization under the laws of the United Arab Emirates. This allegiance, however, is diminished somewhat by the fact that MIS has no employees from that country and a large percentage of them are from the United States.

The place of the contract is the fifth factor, and another that is entitled to more weight in this context. As the district court stated, Coats apparently executed an Arabic contract in the United Arab Emirates for the purpose of obtaining a work visa; however, the parties agreed to all of the contract terms in Mississippi. Thus, Coats' employment contract was formed in Mississippi, and this factor favors United States law. _Cf_. _Fogleman_, 920 F.2d at 283 (noting that plaintiff signed all eight of his contracts in Saudi Arabia). The contract between MIS and Penrod is not relevant to our analysis. _See id._ (focusing on plaintiff's contract with his employer without considering employer's contract with owner/operator of oil platform).

21

The sixth factor, inaccessibility of the forum, is only relevant to forum non conveniens. Lauritzen, 345 U.S. at 589-90. The seventh factor is the law of the forum. The general maritime law of the United States is the law of the forum; however, this factor is entitled to little weight because, by definition, it supports the law of the forum. Fogleman, 920 F.2d at 283.

The final factor is the base of operations. In the nontraditional context, we have held that "'it is the base from which the rig is operated on a day-to-day basis rather than the base of operations of the corporate or ultimate owner of the rig which is important for choice of law purposes.'" Id. at 284 (quoting Bailey, 697 F.2d at 1275 n.22). Penrod has a local office in the United Arab Emirates to assist in the operation of Rig 69. The record shows that this office is occupied by the rig superintendent who frequently communicates with Penrod's office in Dallas, Texas by facsimile. We addressed a similar situation in Bailey. There, the local office in Singapore "was in daily contact with the Houston office by telex or telephone, usually providing it with drilling reports." 697 F.2d at 1271 n.6. In addition, "the day-to-day decisions respecting the activities and operations of the [rig] were made by [the area manager] or [the rig manager and drilling superintendent] or by personnel on the rig." Id. We nevertheless agreed that the base of operations was not in the United States. Id. at 1274. Therefore, we are constrained to find that Penrod's base of operations for purposes of this case is in the United Arab Emirates. MIS's base of operations is also in

22

the United Arab Emirates; it has no offices anywhere else. Despite the business it conducts through Lee's Materials in the United States and the fact that it has a substantial number of American employees, its day-to-day operations are clearly conducted in the United Arab Emirates.

After considering the above factors and giving them the weight they deserve in this offshore oil drilling context, we agree with the district court's decision to apply United States law. Of the factors deemed more significant in this context, only the place of the wrongful act favors foreign law; the allegiance of the plaintiff and the place of contract refer us to United States law. The law of the flag and the allegiance of the defendant shipowner also point to United States law. In short, the United States has a greater interest in applying its law to this case than the United Arab Emirates. Coats was recruited in the United States, accepted the job while in this country, was supervised by American employees, suffered injury aboard an American ship, and was flown home to recover. See Albritton, Choice of Law, supra (noting the unlikelihood of courts denying the benefit of American maritime law to an American citizen who is recruited to work overseas and does not give up his permanent United States residence).

Although prior cases are less instructive in this area, where our analysis must be based on the facts of each case, our decision today is consistent with our precedent. With one exception, our decisions involving nontraditional, "brownwater," vessels have involved a foreign plaintiff injured off the coast of a foreign

23

country seeking the protections of American law. We have uniformly rebuffed these attempts. See, e.g. Cuevas v. Reading & Bates Corp., 770 F.2d 1371 (5th Cir. 1985); Koke v. Phillips Petroleum Co., 730 F.2d 211 (5th Cir. 1984); Bailey v. Dolphin Int'l, Inc., 697 F.2d 1268 (5th Cir. 1983); Vaz Borralho v. Keydril Co., 696 F.2d 379 (5th Cir. 1983); Chiazor v. Transworld Drilling Co., 648 F.2d 1015 (5th Cir. 1981).

The one exception is Fogleman, where we refused to allow an American plaintiff to sue under United States law for an injury that occurred in Saudi Arabia. Fogleman, a Louisiana resident, went to work for Fluor Arabia in Saudi Arabia. He applied for the job by completing a "Foreign Employment Application" and mailing it to Saudi Arabia. Fluor Arabia is a subsidiary of Fluor Corporation, a Delaware corporation with its principle place of business in California, but is only authorized to do business in Saudi Arabia. Fogelman worked under a series of eight one-year contracts, all signed in Saudi Arabia, and lived aboard a boat flying the Saudi Arabian flag. Fluor Arabia had a contract with ARAMCO, and pursuant to that contract, Fluor Arabia assigned Fogleman to work with ARAMCO. Fogelman sustained a sharp pain in his chest while transferring from an oil platform to a workboat that flew the Panamanian flag and later suffered a heart attack, allegedly caused by excessive work hours aboard ARAMCO's oil platform. Fogleman sued ARAMCO and Fluor Arabia, and we affirmed the district court's application of Saudi Arabian law to ARAMCO and Fluor Corporation. 920 F.2d at 281.

24

The contacts with the United States in Fogleman were not as strong as in this case. The vessels involved did not fly the United States flag, and all of the plaintiffs contracts were signed in the foreign country. Moreover, the allegiance of both defendants was foreign. Id. at 282-83. "[T]he only significant factor pointing to the application of United States law [was] the domicile of the plaintiff." Id. at 284. As discussed, the connections with the United States in this case are substantial and justify a different result than the one we reached in Fogleman.

IV.

Given our affirmance of the district court's application of the general maritime law, we find no abuse of discretion in the denial of MIS's motion to dismiss for forum non conveniens. The private and public factors to be considered do not overcome the deference due Coats' choice of his home state as the forum and the fact that this case has already been tried. See In re Air Crash Disaster Near New Orleans, 821 F.2d 1147, 1167 (5th Cir. 1987) (en banc) (stating that "[t]he fact that a trial on the merits has occurred in the plaintiff's selected forum does have some effect on our decision of whether the district court abused its discretion"). MIS has not shown that it was "greatly prejudiced" by having to defend the case in Mississippi. Id. at 1168.

V.

Penrod has devoted much of its energy in this appeal to urging us to abolish or modify the doctrine of joint and several liability. The jury found Penrod and MIS to be 20% and 60%

25

responsible, respectively, but as a result of joint and several liability, Coats can look to Penrod for the entire 80%. Coats would obtain 80% from Penrod though the jury determined Coats and Penrod to be equally at fault. Thus, Penrod maintains, joint and several liability is incompatible with comparative fault.[13] We rejected this proposition in <u>Simeon v. T. Smith & Son, Inc.</u>, 852 F.2d 1421, 1429-30 (5th Cir. 1988), and we are bound by <u>Simeon</u> without the <u>en banc</u> court. <u>But see</u> <u>id</u>. at 1436 (Garwood, J., concurring in part and dissenting in part) (arguing for "modified joint liability").

Additionally, Penrod points out that at least thirty-three states have either abolished or modified the doctrine of joint and several liability and urges us to change the federal maritime law based on this statement of policy. We are well aware of our duty as an admiralty court to look to legislative enactments for policy guidance. <u>Miles v. Apex Marine Corp.</u>, 111 S. Ct. 317, 323 (1990); <u>Moragne v. States Marine Lines</u>, 90 S. Ct. 1772, 1781-83 (1970). However, this change in policy among the states is in conflict with the maritime policy recognized in <u>Simeon</u>:

> To date, under general maritime [law], the policy of the Supreme Court has been clear -- ensure that injured plaintiffs are made whole, even at the expense of overburdening defendants.

---

[13]Penrod appears to be motivated in this argument by a fear that the judgment is unenforceable against MIS in the United Arab Emirates, and Penrod may have to absorb the effect of MIS's good fortune. It is true that the doctrine of joint and several liability places such risk of nonrecoverability entirely on the defendants, but we are not convinced that this is an unjust result in this case. The decision to do business with MIS was Penrod's, not Coats.

852 F.2d at 1454 (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 271-72 n.30 (1979)) (King, J., joined by Williams, J., specially concurring).  While a strong statement of policy from the states has much force in this context, that sentiment must nevertheless give way to a contrary policy established by the Supreme Court.

Penrod also contends that applying joint and several liability in the context of comparative fault ignores the jury's findings of fault and thereby amounts to a violation of its right to a jury trial under the Seventh Amendment.  Under current law, however, a defendant forced to pay more than its share can recover against its codefendants for contribution based on the jury's findings of fault.  Thus, the jury's findings are adhered to.  This system simply forces the defendants to work it out between themselves and ensures the plaintiff that he will in fact recover the judgment. Ideally, the end result with or without joint and several liability is the same.

## VI.

Coats' cross-appeal does not raise any grounds for reversal. First, we affirm the district court's summary judgment ruling that Coats was not a Jones Act seaman.  The determination of seaman status is "an inherently factual question."  Barrett v. Chevron U.S.A., Inc., 781 F.2d 1067, 1074 (5th Cir. 1986) (en banc). "Nonetheless, if the requisite proof is absent, a court may decide that seaman status is lacking as a matter of law."  Kerr-McGee

27

<u>Corp. v. Ma-Ju Marine Servs., Inc.</u>, 830 F.2d 1332, 1335 (5th Cir. 1987). Seaman status is a jury question only if there is evidence that (1) the plaintiff was "assigned permanently to a vessel . . . or performed a substantial part of his work on the vessel" and (2) the work he performed assisted the vessel in accomplishing its mission or contributed to the function or maintenance of the vessel. <u>Offshore Company v. Robison</u>, 266 F.2d 769, 779 (5th Cir. 1959). The requirement of assignment to a vessel also includes assignment to "an identifiable fleet of vessels." <u>Braniff v. Jackson Ave.--Gretna Ferry, Inc.</u>, 280 F.2d 523, 528 (5th Cir. 1960).

Because Coats was not permanently assigned to a vessel and did not perform a substantial part of his work aboard a vessel, his seaman status turns on whether he worked aboard a fleet. A fleet is "an identifiable group of vessels acting together or under one control." <u>Barrett</u>, 781 F.2d at 1074. Although we have decided that the employer need not be the owner or operator of the group of vessels, <u>Bertrand v. International Mooring & Marine, Inc.</u>, 700 F.2d 240, 245 (5th Cir. 1983), we have "reject[ed] the notion that fleet of vessels in this context means any group of vessels an employee happens to work aboard." <u>Barrett</u>, 781 F.2d at 1074. In <u>New v. Associated Painting Servs, Inc.</u>, 863 F.2d 1205, 1208 (5th Cir. 1989), plaintiff, like Coats, worked for an independent contractor that assigned its employees to perform jobs for owners and operators of various vessels. He performed sandblasting and painting aboard vessels owned by at least eight unrelated entities.

28

He was injured aboard a semi-submersible drilling rig owned by one of these entities and sued his employer under the Jones Act. <u>Id</u>. at 1207  We affirmed the summary judgment denying seaman status, because the vessels plaintiff worked aboard were not under common ownership or control.   <u>Id</u>. at 1208.   <u>See also</u> <u>Langston v. Schlumberger Offshore Servs</u>, 809 F.2d 1192, 1194 (5th Cir. 1987) (plaintiff who performed jobs for ten unrelated owners aboard fifteen different vessels not a seaman).  Likewise, the vessels Coats worked on were owned by the customers of MIS.  MIS did not own or control these vessels. Therefore, the district court correctly determined that Coats did not work on a fleet.

Second, by failing to include the transcript of trial in the record, Coats has waived his contentions regarding the sufficiency of the evidence to support the jury's finding of contributory negligence and the directed verdict for Penrod and MIS on the issue of punitive damages under general maritime law.  Rule 10(b)(2) of the Federal Rules of Appellate Procedure requires an appellant who intends to argue that a finding or conclusion is unsupported by the evidence or contrary to the evidence to include a transcript of all relevant evidence. Fed. R. Civ. P. 10(b)(2).  Defendants' appeals only pertain to pre-trial rulings of law and therefore neither needed the trial transcript for its arguments, and they did not order it.  Therefore, Coats was required to include the transcript to challenge the jury's finding of contributory negligence and the directed verdict.  Because the transcript is not in the record, we cannot consider these arguments.

Third, Coats has also waived his claim for prejudgment interest. Prejudgment interest may only be awarded for past damages, but Coats did not request a segregation of past and future damages in the jury interrogatories. See Brister v. AWI, Inc., 946 F.2d 350, 362 (5th Cir. 1991).

We finally consider whether the district court abused its discretion in failing to award certain costs to Coats. Coats submitted a Bill of Costs for $34,405.25, and the Clerk taxed that amount against defendants. After defendants moved the court to review the taxation of costs, the court agreed that the costs were excessive and instructed the parties to attempt to reach a compromise on a lower amount. After their efforts to compromise failed, the district court awarded $7,889.04. Coats contends for an additional $23,937.34.

Rule 54(d) of the Federal Rules of Civil Procedure provides for an award of costs "to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). 28 U.S.C. § 1920 defines recoverable costs,[14] and a district court may decline to award the costs listed in the statute but may not award costs

---

[14]28 U.S.C. § 1920 lists

(1) fees of the clerks and marshals;
(2) fees of the court reporter for any and all of the stenographic transcript necessarily obtained for use in the trial;
(3) fees and disbursements for printing and witnesses; and,
(4) fees for exemplification and copies of papers necessarily obtained for use in a case;
(5) docket fees under § 1923 of this title;
(6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation.

omitted from the list.  Crawford Fitting Co. v. J.T. Gibbens, Inc.,
107 S. Ct. 2494, 2498 (1987).  "Only when a clear abuse of
discretion is shown can an award of costs be overturned."  In re
Nissan Anti-Trust Litigation, 577 F.2d 910, 918 (5th Cir. 1978);
see also Fogleman, 920 F.2d at 285-87.

Coats claims an additional $1,179.14 for the cost of
obtaining transcripts of several depositions.  Under § § 1920(2)
and (4), prevailing parties are entitled to the costs of original
depositions and copies if "necessarily obtained for use in the
trial."  We do not require that a deposition be actually introduced
into evidence to meet this requirement.

> If, at the time it was taken, a deposition could reasonably be
> expected to be used for trial preparation, rather than merely
> for discovery, it may be included in the costs of the
> prevailing party.  Similarly, a deposition copy obtained for
> use during trial or for trial preparation, rather than for the
> mere convenience of counsel, may be included in taxable costs.
> Whether a deposition or copy was necessarily obtained for use
> in the case is a factual determination to be made by the
> district court.  We accord great latitude to this
> determination.

Fogleman, 920 F.2d at 285.  The district court awarded $3,548.45
for depositions it determined, as stated in its order, to be
necessarily and reasonably obtained in preparation for trial.
Coats has not demonstrated that the district court's determination
of which depositions were necessary was a clear abuse of
discretion.

The district court denied Coats' request for travel expenses
in the amounts of $711.69 and $642.35, $1,744.96 for "blow-ups"
used at trial, and $1,175.00 in video technician fees incurred for

video depositions.  These expenses are not included in § 1920 and therefore are not recoverable.

Coats seeks payment of a witness fee, $87.50, and expert fee, $1,232.65, for an expert who attended trial but did not testify as a result of the court's directed verdict and $3,298.84 for a foreign law expert.  Because the expert witness did not testify, we find no clear abuse of discretion in the refusal to tax the witness fee.  Additionally, expert fees are not recoverable.  See 28 U.S.C. § § 1821, 1920; Crawford, 107 S. Ct. 2494.

Coats also claims $518.65 for certified copies of various documents and the cost to photocopy certain documents attached to depositions in the amounts of $1,831.73 and $121.88.  The cost of these copies may be taxed if the copies were "necessarily obtained for use in the case."  28 U.S.C. § 1920(4).  The district court awarded $3,045.63 for copies and exemplifications it determined, as stated in its order, to be necessarily and reasonably obtained.  We will not disturb the court's determination of which copies were necessary.

Finally, Coats claims an additional $11,392.95 for the "[c]opy cost of pleadings, correspondence and documents necessary due to defense counsel's 'paper war.'"  According to Coats' Bill of Costs, almost all of this amount covers "in-house" copying.  We cannot judge the necessity of these expenses without a more specific statement.  In any event, the district court was in the best position to assess the equities of the alleged "paper war."

AFFIRMED.

32

**DeMOSS, Circuit Judge, dissenting:**

I am unable to concur with the decision of my colleagues in one crucial respect: I think proper evaluation of the Lauritzen-Rhoditis factors requires that the choice of law determination in this case be made in favor of the law of the United Arab Emirates (UAE) rather than that of the United States. My differences with the panel on the Lauritzen-Rhoditis choice of law factors involve the first factor, i.e. the place of the wrongful act; the fourth factor, i.e. the allegiance of the defendant ship owner; and the fifth factor, i.e. the place of the contract.

Looking first at the place of the wrongful act, the panel opinion devotes one sentence to analysis of this subject. It recognizes that "the accident occurred in the territorial waters of the United Arab Emirates" and that since this is a "nontraditional maritime case," that factor is entitled to considerable weight. There is no doubt that Coats was injured while on board the Penrod 69, a jackup drilling rig owned and operated by Penrod Drilling Corporation (Penrod). Where the Penrod 69 was at the time of the accident is ambiguously stated in the panel opinion. In the opening paragraph, the rig is described as being "off the coast of the United Arab Emirates," but later on in the factual description, it is described as being "located in the Port of Mina Saqr in the territorial waters of the United Arab Emirates." In my judgment there is a crucial difference between being "off the coast" and being "in port," for the latter necessarily implies that the vessel

was within the boundary recognized for international law purposes as the boundary of the United Arab Emirates and within what would be referred to under United States nomenclature as the "inland waters" of Ra's Al Khaymah, the particular emirate in which that port is located. We are talking about the Penrod 69 being within inland waters of Ra's Al Khaymah just like we would talk about it being within the inland waters of the State of Texas if it were in the Port of Galveston or within the inland waters of the State of Mississippi, if it were it the Port of Biloxi. Secondly, the Penrod 69 had been in these inland waters for some eight or nine months prior to the date of Coats' injury. The records are clear that on August 12, 1987, the Penrod 69 was surveyed for its annual condition certificate; and at that time, the survey report indicates that the "vessel lay jacked-up" in this port. The Penrod 69 was out-of-service, deactivated, not operated, and not occupied by any personnel other than a watchman, up until January 1988, when as a result of a new contract for its use in a Persian Gulf drilling activity, Penrod commenced the task of preparing Penrod 69 to go back into service. During this interval that it was deactivated, the Penrod 69 functioned solely as an artificial wharf or dock for the purpose of storing the equipment and facilities thereon, with its legs standing on the bottom of the port and its hull up out of the water. In accomplishing the refurbishing work, Penrod used its own personnel (assumptively the crew of the Penrod 69) and other categories of "contract labor, catering, and service personnel." MIS was hired by Penrod to assist in the refurbishing

34

work and MIS designated Coats to operate the MIS pump which was brought on board to provide pressure to test certain pressurized systems of the rig. The daily reports as to the personnel working on board the rig, which are in the record, reflect that the totals of contract labor, catering, and service personnel always exceeded the number of Penrod personnel. The record does not clearly indicate whether on the date of injury, April 12, 1988, the Penrod 69 was still in a "jacked-up" position, or whether its hull had been lowered into the water. Obviously, if it was still at a jacked-up position, its categorization as a "vessel" is in serious doubt. Even if it had been lowered into the water, however, the nature and extent of the work going on, and the number of outside personnel deployed in such work, clearly demonstrate that the repair and refurbishing activities were beyond the capacity of the "crew" of the Penrod 69 to accomplish; and that such work could be accomplished only with the ready availability and access of shore-based personnel and facilities. In my view, under these facts, the "place of the wrongful act" element of the Lauritzen-Rhoditis factors should be given more than just "considerable weight" as the panel does. It should be the controlling factor in the choice of law decision. I have looked for and have been unable to find any Supreme Court decision or Fifth Circuit decision which has applied United States law to resolve the claim of a shore-side worker injured while assisting in the refurbishing of a jacked-up drilling rig while it was located within the inland waters of another nation; and in my opinion the panel decision constitutes an

unacceptable extension of United States law into areas where simple comity among nations requires that the law of the place of the casualty apply.

My second area of disagreement with the panel regarding the Lauritzen-Rhoditis factors concerns the factor of allegiance of the defendant shipowner. I do not quarrel with the panel's determination that the allegiance of Penrod as owner of the Penrod 69, is to the United States. But, in my view, the factor of "allegiance of the defendant shipowner" has materiality only in the circumstance where the flag of the vessel and the allegiance of the defendant shipowner are different (i.e. the flag is a flag of convenience), and the law of the nation of allegiance of the defendant shipowner can appropriately be applied to the determination of rights between that shipowner and his seaman employee when that vessel is engaged in international commerce. In this case, however, the allegiance of the defendant shipowner is an inconsequential factor: first, because Penrod 69 is documented under the United States flag and Penrod's allegiance is to the United States and there is no flag of convenience involved; and secondly, and more importantly, because both the district court and the panel opinion recognize that there was no employment relationship as seaman, or otherwise, between Penrod and Coats. The majority's use of the allegiance of the defendant shipowner to tip the scales in favor of application of United States law would, in my judgment, be improvident even if the only defendant in this case were Penrod; because that factor should be applied only where

36

there is an employment relationship between the injured plaintiff and the defendant shipowner. But, Penrod is not the only defendant in this case; and the other defendant, MIS, is not a shipowner; it is an entity whose allegiance is owed to the laws of the United Arab Emirates; and it is in fact the employer of Coats. I am truly puzzled by the statement of the panel opinion that the allegiance of a MIS is "diminished somewhat" because it has no employees from the UAE and a large percentage of its employees are from the United States. When, where, and how did the "allegiance" of a corporate entity come to be determined (or "diminished") by consideration of the citizenship or nationality of its employees? Does a corporation owe "allegiance" to any nation other than the nation which created it? Would the panel say that a corporation organized under the laws of the state of Delaware is not truly a Delaware corporation for purposes of our diversity law unless most of its employees are from Delaware? I have looked and have not found any Supreme Court or any Fifth Circuit decision which has applied United States law to determine the rights and obligations between a citizen of the United States who is injured in a foreign country during the course and scope of his employment with a corporate entity organized under the law of that foreign country. In my judgment, the panel opinion improvidently extends United States law to the set of circumstances involved in this case by giving greater weight to the allegiance of the defendant shipowner instead of to the allegiance of the defendant employer.

37

Finally, I question the correctness of the panel decision in evaluating the place of contract factor in the _Lauritzen_-_Rhoditis_ analysis. Here again, the majority misconstrues the significance of this factor. I recognize that Coats was recruited by representatives of MIS at his home in Mississippi and that the basic terms of his employment agreement were negotiated and orally agreed upon during this recruitment visit. However, it is clear beyond doubt that he was recruited and "employed" to work in the United Arab Emirates and not aboard any vessel. Furthermore, it is clear that in order to get the necessary visa to enter the United Arab Emirates, Coats and MIS "executed an Arabic contract," and that Coats then applied for and received the necessary work permit from the UAE which would permit him to reside there during his employment. This circumstance of a work permit is a special factor present in this case which has not been present in any of the other choice of law cases cited in the majority opinion; and, in my view, necessitates a determination that the law of the UAE should apply to an injury occurring in the UAE during employment under a work permit.

In his original appellee's brief, Coats argued: "U.S. Maritime Law applies whenever a U.S. citizen is injured on a U.S. flag drilling vessel anywhere in the world." (p. 52). The cases cited by Coats as precedent for that proposition do not support his assertion. But the majority opinion in effect arrives at the same conclusion by misinterpretation and misevaluation of the _Lauritzen_-_Rhoditis_ factors. Because I think such a conclusion is bad law

38

under the facts of this case, and will produce undesirable effects when applied as a precedent, I would reverse the district court's judgment and remand the case to the district court for retrial in accordance with the laws of the United Arab Emirates.

In arriving at this result, I rely on the following line of Fifth Circuit cases: Chiazor v. Transworld Drilling Co., Ltd., 648 F.2d 1015 (1981); Zekic v. Reading & Bates Drilling Co., 680 F.2d 1107 (1982); Bailey v. Dolphin Intern., Inc., 697 F.2d 1268 (1983); Koke v. Phillips Petroleum Co., 730 F.2d 211 (1984); Schexnider v. McDermott Intern., Inc., 817 F.2d 1159 (1987); and Fogleman v. Aramco, 920 F.2d 278 (1991). All of these involve "nontraditional" vessels similar in nature and function to the Penrod 69 and all of which determined that the law of another nation, other than the United States, applied.